UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

ROSSANA ROSADO, in her official capacity as NEW
YORK STATE SECRETARY OF STATE, BASIL SEGGOS,
in his official capacity as COMMISSIONER OF THE NEW
YORK STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION, and the STATE OF NEW YORK,

                              Plaintiffs,

          -against-

E. SCOTT PRUITT, in his official capacity as Administrator
of the United States Environmental Protection Agency, the
UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY, and DEBORAH SZARO, in her official capacity
as Acting Regional Administrator of EPA Region 1,

                             Defendants.
_____

**AMENDED
COMPLAINT**

**No. 17-cv-04843
(Korman, J.)
(Mann, M.J.)**

      Plaintiffs Rossana Rosado, as Secretary of the New York State Department of State

("NYSDOS"), Basil Seggos, as Commissioner of the New York State Department of

Environmental Conservation ("NYSDEC"), and the State of New York (collectively, "New

York"), by their attorney Eric T. Schneiderman, Attorney General of the State of New York, as

and for their complaint, allege as follows, based on information and belief:

## NATURE OF THE ACTION

      1.     This case challenges defendant United States Environmental Protection Agency

("EPA")'s recent designation of a permanent open water site in the eastern Long Island Sound

for disposal of materials dredged from rivers and harbors long impacted by commerce and

industry (the "Eastern Site"). EPA designated the Eastern Site, in an area never before used for

dredged material disposal, pursuant to the Marine Protection, Research, and Sanctuaries Act,

commonly known as the Ocean Dumping Act, 33 U.S.C. §§ 1401-1445.  The Eastern Site is the

third permanent disposal site designated by EPA in 2016 within the Sound, following prior

designations of the Western Long Island Sound Disposal Site ("Western Site") and the Central

Long Island Sound Disposal Site ("Central Site").  EPA has also designated another permanent

site near the Eastern Site – the Rhode Island Sound Disposal Site ("Rhode Island Site").

Attached Exhibit A displays these Sites and other geographic features referenced in this

complaint.

      2.      In 1972, Congress enacted the Clean Water Act "to restore and maintain the

chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The

Act imposed new limits on the discharge of pollutants into the waters of the United States,

including coastal waters.  Under Section 404(a), the Clean Water Act requires a permit issued by

the Army Corps of Engineers ("Army Corps") to "discharge … dredged or fill material into the

navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).

      3.      Shortly after enacting the Clean Water Act, Congress added to that statute's

protections against water pollution in the ocean by enacting the Ocean Dumping Act, declaring

"that it is the policy of the United States to regulate the dumping of all types of materials into

ocean waters and to prevent or strictly limit the dumping into ocean waters of any material which

would adversely affect human health, welfare, or amenities, or the marine environment,

ecological systems, or economic potentialities."  33 U.S.C. § 1401(b).  The Ocean Dumping Act

established stringent regulatory requirements for disposing dredged materials into the oceans.

      4.      As originally enacted, Title I of the Ocean Dumping Act applied only to the

transportation and dumping of material, including dredged sediments, into ocean waters beyond

the territorial sea, which extends approximately 12 miles out to high sea from the baseline/low

water mark of the coast.  In 1980, Congress amended the Ocean Dumping Act by extending its

protections to the Long Island Sound – an area *within* the territorial sea.  Accordingly, this

amendment – known as the Ambro Amendment – requires that any federal projects involving

dredging or dumping into the Sound comply with the Ocean Dumping Act.  Any private entities

seeking to dredge projects greater than 25,000 cubic yards ("cy") within the Sound must also

comply with the Ocean Dumping Act.

5.      EPA designated the Long Island Sound an Estuary of National Significance in

1988.  33 U.S.C. § 1330.  Estuaries are places where ocean saltwater mixes with freshwater from

rivers and streams, providing vital nesting and breeding habitat for many aquatic and benthic

species.  Long Island Sound has been one of the most productive estuaries in the United States.

While commercial fishing has significantly declined, the Sound remains a critical marine

resource to New York and neighboring states.

6.      Disposing dredged materials in an estuary can present a significant risk of

environmental harm.  Materials dredged from in and around rivers and harbors adjoining sites of

historic or current commercial or industrial operations often contain toxic substances injurious to

the marine environment and humans.  Vessels hauling and discharging such dredged materials

must be safely integrated with the flow of other commercial and recreational vessels to avoid

accidents.

7.      In order to manage these environmental risks, disposal subject to the Ocean

Dumping Act is allowed only pursuant to a permit issued by the Army Corps.  Open water

disposal of dredged material must take place at a permanent site designated by EPA pursuant to

Section 102 of that Act, 33 U.S.C. § 1412, or a short-term "alternative" site selected by the Army

Corps and approved by EPA pursuant to Section 103 of the Act, 33 U.S.C. § 1413.

8.      The Ocean Dumping Act and attendant regulations require EPA consider a number of criteria before designating an appropriate disposal site.  Such criteria are designed to prevent the disposal of dredged material that "would adversely affect human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities."  The criteria include, in the first instance, the need for an ocean disposal site in the area being considered.  33 U.S.C. § 1412(a)(A).  The laws and regulations governing disposal site designation also seek to limit the number of locations impacted by disposal, requiring EPA to "wherever feasible, designate ocean dumping sites … that have been historically used."  40 C.F.R. § 228.5(e).  Additionally, the Ocean Dumping Act regulations require that disposal sites be selected to "minimize the interference of disposal activities with other activities in the marine environment," including "avoiding . . . regions of heavy commercial . . . navigation."  40 C.F.R § 228.5(a).

9.      Under the U.S. Department of Commerce regulations implementing the federal Coastal Zone Management Act, 16 U.S.C. § 1456, EPA was required to comply with the coastal zone consistency requirements in 15 C.F.R. Part 930, Subpart C prior to permanently designating the Eastern Site pursuant to Section 102 of the Ocean Dumping Act.  Under the Coastal Zone Management Act, New York's Secretary of State is authorized to concur, conditionally concur, or object to, EPA's determination that designation of the Eastern Site is consistent "to the maximum extent practicable" with the enforceable policies of the federally-approved New York Coastal Management Program ("NYS Coastal Management Program").  In this case, the New York Secretary of State objected to EPA's determination of coastal zone consistency and EPA's designation of the Eastern Site.

10.    EPA designated the Eastern Site in a final rule dated December 6, 2016, published at 81 Fed. Reg. 87820.  The site is located south of the mouth of the Thames River at New London, Connecticut, with its boundary extending to within 0.2 nautical miles of the New York boundary, and within 2.3 nautical miles of Fishers Island, New York.  EPA supported the designation with a concurrently issued final "Supplemental Environmental Impact Statement for the Designation of Dredged Material Disposal Site(s) in Eastern Long Island Sound," dated November 2016 (the "SEIS").

11.    EPA's designation of the Eastern Site, a final agency action, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, because EPA:

(a) unreasonably inflated the projected dredged material disposal needs for the area, then determined that a permanent disposal site was needed in the eastern Sound although adequate capacity existed even for that inflated projected need at the three existing permanent disposal sites - the Western, Central, and Rhode Island Sites;

(b) violated its site-designation regulations, which require the agency to "wherever feasible, designate ocean dumping sites … that have been historically used[,]" 40 C.F.R. § 228.5(e);

(c) erroneously evaluated the impacts of designating the Eastern Site on existing commercial navigation and inexplicably excluded commercial vessel traffic data showing heavy passenger and automobile ferry traffic passing directly through the designated site;

(d) unreasonably concluded that the designation and use of the Eastern Site would have no significant adverse impacts on human health or the environment because only dredged materials deemed "suitable" (*i.e.*, environmentally benign) under the Ocean Dumping Act testing criteria would be disposed of at the site, when in fact substantial quantities of the projected

5

dredged materials are not subject to a suitability determination under the Ocean Dumping Act but rather subject only to the less stringent criteria of the Clean Water Act – which the agency failed to evaluate or explain in its designation record; and

(e) erroneously determined that its designation of the Eastern Site is consistent to the maximum extent practicable with New York's federally-approved coastal management program under the Coastal Zone Management Act.

12.     New York will be harmed by the designation and resulting use of the Eastern Site. New York has long pursued -- with the concurrence of Connecticut and regulatory agreement by EPA -- the goal of reducing or eliminating the disposal of dredged materials in the Sound, over which New York has concurrent jurisdiction with Connecticut under the Coastal Zone Management Act.  The designation of a third, permanent disposal site in the Sound will impede achievement of that goal.  Contaminants excavated primarily from tidal river areas and bays along Connecticut's coast will be relocated to the Eastern Site, located in a previously unused area of the Sound closer to New York's boundary.  The Long Island Sound's ecosystem is now largely shielded from the potential adverse impact of these contaminants, which are currently buried beneath riverine and harbor sediments.  Mobilization through dredging and placement of them on the floor of the Long Island Sound at the Eastern Site will create the potential for the introduction of those contaminants into the food chain, allowing lobsters and other mobile biota to absorb them through bioaccumulation and transfer them to New York waters.  Moreover, use of the site presents the risk of interference with the safety, logistics, and flow of important interstate ferry traffic between New York and New England via the Cross Sound Ferry, which travels between Orient Point, New York and New London, Connecticut, and whose route crosses the Eastern Site.

13.     For these reasons, the Court should vacate EPA's final rule designating the Eastern Site as a permanent dredged materials disposal site as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## JURISDICTION AND VENUE

14.     Because the claims for relief pled in this complaint arise under the laws of the United States, including the Ocean Dumping Act of 1972, 33 U.S.C. §§ 1401-1445, the Coastal Zone Management Act, 16 U.S.C. §§ 1451-1466, and the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706, this Court has jurisdiction over those causes of action pursuant to 28 U.S.C. §§ 1331, 33 U.S.C. § 1415(g)(1), and 5 U.S.C. §§ 701-706.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because one or more of the plaintiffs reside in this district and no real property is involved in this action.

## THE PARTIES

16.     Plaintiff Rossana Rosado is the Secretary of State of New York and the administrative head of NYSDOS, an agency of the State of New York, which is authorized to administer the NYS Coastal Management Program under the Coastal Zone Management Act. The Secretary has the authority to determine whether federal agency activities are consistent, to the maximum extent practicable, with the enforceable coastal policies of the Program.

17.     Plaintiff Basil Seggos is the Commissioner of NYSDEC, an agency of the State of New York that is responsible for environmental protection in the state and protection of New York's natural resources, including New York's waters and the aquatic life within.

18.     Plaintiff State of New York is a sovereign entity that brings this action in its proprietary capacity and as *parens patriae* on behalf of its citizens and residents as a body politic and a sovereign entity.

7

19.     Defendant EPA is an executive branch agency of the federal government charged with implementing the Ocean Dumping Act and the Clean Water Act.  EPA is responsible for, among other things, designating permanent open water disposal sites under the Ocean Dumping Act and ensuring that such sites are designated in accordance with the requirements of the Ocean Dumping Act, the Coastal Zone Management Act, and the Administrative Procedure Act. Defendant E. Scott Pruitt is Administrator of EPA.

20.     Defendant Deborah Szaro is Acting Regional Administrator of EPA Region 1, which covers New England.  EPA Region 1 is the region responsible for designating the Eastern Site.

## STATUTORY AND REGULATORY BACKGROUND

### A.     The Ocean Dumping Act

#### 1.   Designation of Dredged Material Disposal Sites under the Ocean Dumping Act

21.     In 1972, Congress enacted the Ocean Dumping Act to address the dangers of unregulated dumping of waste materials into ocean waters.  The primary intent of the Ocean Dumping Act is to prevent any significant adverse ecological and other effects from ocean dumping.  To minimize such effects, Congress banned the dumping of dredged material into the ocean except at sites designated by EPA (or at temporary sites designated by the Army Corps) to minimize the impacts of dumping on the marine environment.  Section 101 of the Act prohibits, unless authorized by permit, (1) transportation from the United States of waste materials for the purpose of dumping the waste into the ocean, and (2) dumping of waste materials into the territorial seas of the United States or into contiguous waters. 33 U.S.C. § 1411.

22.     With the exception for Long Island Sound, Title I of the Act applies to ocean waters outside the United States territorial sea.

23.     In 1980, Congress amended the Act to make it applicable to the Long Island Sound through the "Ambro Amendment."  33 U.S.C. § 1416(f).  Long Island Sound is the only area inside the nation's territorial sea to which the Act applies.  The Ambro Amendment requires that any dumping of dredged material in Long Island Sound by federal agencies, or by private applicants whose projects exceed 25,000 cy of dredged material is subject to the sediment testing criteria of the Act.  33 U.S.C. § 1416(f).  For private projects dumping less than 25,000 cy of dredged material into the Sound, the applicant must meet only the less stringent standards of Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

24.     The Ocean Dumping Act requires parties wishing to dispose of dredged materials into ocean waters (or in certain instances, the Sound) to obtain a permit from the Army Corps.  33 U.S.C. §§ 1412-14.  Where the Corps is the entity proposing the disposal, the Corps must do so in accordance with regulations promulgated by EPA that apply the same factors as the Corps would apply in deciding whether to issue a permit to another applicant.  33 U.S.C. § 1413(e).  Army Corps determinations to issue permits, or to approve its own proposed disposal, are subject to EPA concurrence.  33 U.S.C. § 1413(c).

25.     Dredged materials approved for ocean disposal under the Act must be disposed of either at a site permanently designated by EPA, or at an alternative site designated for a limited duration by the Army Corps in a manner consistent with EPA's site designation process.  In making site designations, EPA must consider a number of statutory criteria, plus such other criteria as EPA deems necessary to effectuate the purpose of the Act.  33 U.S.C. § 1412(a).  The Act requires consideration of the following statutory factors in site designation:

(A) The need for the proposed dumping.

(B) The effect of such dumping on human health and welfare, including economic, esthetic, and recreational values.

(C) The effect of such dumping on fisheries resources, plankton, fish, shellfish, wildlife, shore lines, and beaches.

(D) The effect of such dumping on marine ecosystems, particularly with respect to—

(i) The transfer, concentration, and dispersion of such material and its byproducts through biological, physical, and chemical processes,

(ii) potential changes in marine ecosystem diversity, productivity, and stability, and

(iii) species and community population dynamics.

(E) The persistence and permanence of the effects of the dumping.

(F) The effect of dumping particular volumes and concentrations of such materials.

(G) Appropriate locations and methods of disposal or recycling, including land-based alternatives and the probable impact of requiring use of such alternate locations or methods upon considerations affecting the public interest.

(H) The effect on alternate uses of oceans, such as scientific study, fishing, and other living resource exploitation, and nonliving resource exploitation.

(I) In designating recommended sites, the Administrator shall utilize wherever feasible locations beyond the edge of the Continental Shelf.

33 U.S.C. §§ 1412 (a) & (c).

26.     EPA has promulgated additional general and specific site selection criteria to implement the site selection process.  *See* 40 C.F.R. §§ 228.5 & 228.6.  These include the requirement that EPA "will, wherever feasible, designate ocean dumping sites … that have been historically used." 40 C.F.R. § 228.5(e).

27.     EPA's criteria for site selection also require that the agency consider "interference with shipping . . . and other legitimate uses of the ocean," 40 C.F.R. § 228.6(a)(8).  The regulations more specifically mandate that: "[t]he dumping of materials into the ocean will be permitted only at sites or in areas selected to minimize the interference of disposal activities with

10

other activities in the marine environment, particularly avoiding … regions of heavy commercial or recreational navigation."  40 C.F.R. § 228.5(a).

28.     EPA must also consider the "types and quantities of wastes that will be disposed of" at ocean disposal sites being considered for designation. 40 C.F.R. § 228.6(a)(4).

### 2.   Determining the Suitability of Dredged Materials for Marine Disposal Under the Ocean Dumping and Clean Water Acts

29.     As noted above, Long Island Sound is the only part of the territorial sea to which the Ocean Dumping Act applies, which creates a unique regulatory structure.  The Ambro Amendment "subjects the Sound to two qualitatively different regulatory schemes."  *Town of Huntington v. Marsh*, 859 F.2d 1134, 1139 (2d Cir. 1988).

30.     For all federal projects and all private projects that exceed 25,000 cy of dredged materials, disposal of such materials in the Sound is reviewed under both Section 404 of the Clean Water Act, 33 U.S.C. § 1344(a), and Section 103 of the Ocean Dumping Act, 33 U.S.C. § 1413(a).  While these statutes are similar in some respects, there are important substantive and procedural differences between them.

31.     Disposal of dredged materials from non-federal projects of less than 25,000 cy is reviewed only under Section 404 of the Clean Water Act.

32.     Regulations promulgated under the Ocean Dumping Act require analysis of the types of sediments to be dredged before permits may be issued (or a Corps project authorized). The Army Corps must evaluate the "suitability" of the dredged material for disposal based on its projected impact on human health, the marine environment, and ecological systems.  EPA has issued regulations concerning the procedures and criteria for the issuance of permits for ocean dumping under the Act, which are codified at 40 C.F.R. §§ 220-229.  These include the procedures and criteria for determining suitability of dredged materials under Section 102 of the

Ocean Dumping Act, codified at 40 C.F.R. § 227.  EPA has also issued regulations for determining the suitability of dredged materials for open water dumping under Section 404 of the Clean Water Act, which are codified at 40 C.F.R. Part 230.

33.    EPA projects that over the next 30 years, non-federal dredging projects in the eastern Long Island Sound region will account for 9,870,200 cy of dredged materials out of a total of 22,583,800 cy of material to be dredged, representing 43.7% of the dredged materials to be disposed of during that period.  SEIS, pp. 2-6, Table 2-3.  Thus, depending on how the non-federal projects are staged (*i.e.,* in amounts either above or below 25,000 cy), up to 43.7% of the total amount of dredged materials to be disposed of from the region could be subject to evaluation for suitability of disposal solely under the Clean Water Act, with the remainder of the 22,583,800 cy subject to evaluation under the Ocean Dumping Act criteria.

34.    The Ocean Dumping Act regulations that govern suitability for open water disposal are more comprehensive and stringent than the regulations governing suitability under the Clean Water Act.  The Ocean Dumping Act regulations strictly prohibit the dumping of the following materials:

(a) High-level radioactive wastes;

(b) Materials produced or used for radiological, chemical, or biological warfare;

(c) Materials insufficiently described in terms of their compositions and properties to permit application of the environmental impact criteria of this subpart; and

(d) Persistent inert synthetic or natural materials which may float or remain in suspension in the ocean and interfere materially with fishing, navigation, or other legitimate uses of the ocean.

40 C.F.R. § 227.5.

12

35.     The Ocean Dumping Act regulations also prohibit the dumping of sediments if they contain certain dangerous substances in levels "other than trace amounts."  These substances are:

> (1) Organohalogen compounds [carbon-based chemicals containing one or more halogens — chlorine, fluorine, bromine, iodine].
>
> (2) Mercury and mercury compounds.
>
> (3) Cadmium and cadmium compounds.
>
> (4) Oil of any kind or in any form, including but not limited to petroleum, oil sludge, oil refuse, crude oil, fuel oil, heavy diesel oil, lubricating oils, hydraulic liquids, and at mixtures containing these, transported for the purpose of dumping insofar as these are not regulated under the [Clean Water Act].
>
> (5) Known carcinogens, mutagens, or teratogens or materials suspected to be carcinogens, mutagens, or teratogens by responsible scientific opinion.

40 C.F.R. § 227.6(a).  "These constituents will be considered to be present as trace contaminants only when they are present in materials otherwise acceptable for ocean dumping in such forms and amounts in liquid, suspended particulate, and solid phases that the dumping of the materials will not cause significant undesirable effects, including the possibility of danger associated with their bioaccumulation in marine organisms."  40 C.F.R. § 227.6(b).

36.     Where sufficient information is known about the composition of particular dredged material, or it is of a particular large grain size that is unlikely to hold contaminants, or is known to be far removed from known existing and historical sources of pollution, then it can be approved for ocean disposal without the need for bioassay testing (testing to measure a substance's concentration or potency by its effect on living cells or tissues).  40 C.F.R. §§ 227.8, 227.13(b), 227.27.

37.     Absent these circumstances, the Ocean Dumping Act regulations mandate bioassay testing to determine whether these standards are met, and if any of these constituents are present,

13

prescribe specific parameters under which such bioassay testing must be conducted.  40 C.F.R. §§ 227.6(c) and (e).

38.     The burden is on the private applicant or the Army Corps (for federal projects), to "demonstrate that such constituents are (1) present in the material only as chemical compounds or forms (e.g., inert insoluble solid materials) non-toxic to marine life and non-bioaccumulative in the marine environment upon disposal and thereafter, or (2) present in the material only as chemical compounds or forms which, at the time of dumping and thereafter, will be rapidly rendered non-toxic to marine life and non-bioaccumulative in the marine environment by chemical or biological degradation in the sea; provided they will not make edible marine organisms unpalatable; or will not endanger human health or that of domestic animals, fish, shellfish, or wildlife."  40 C.F.R. § 227.6(f).  *See also* 40 C.F.R. § 227.6(b).

39.     The Clean Water Act regulations governing suitability of dredged material for open water disposal are generally less stringent and afford greater discretion to the reviewing authority than the Ocean Dumping Act regulations.  The Clean Water Act regulations do not contain comparable categorical prohibitions on the dumping of particular contaminants as those described above in paragraph 34.  Nor do the Clean Water Act regulations mandate particular testing for any categories of toxins that parties seeking to dump must undertake to prove suitability for ocean disposal comparable to those described above in paragraph 37.

40.     The Clean Water Act regulations specifically allow approval of applications without testing of the material to be dumped for "the presence and effects of contaminants," based on a "literature search" on the results of "prior evaluations, chemical and biological testing, scientific research and experience."  40 C.F.R. § 230.60.  If, in the discretion of the

14

permit reviewer, actual testing should be conducted, then 40 C.F.R. § 230.61 sets forth various

tests that "may" be required. *Compare* 40 C.F.R. § 227.6 (Ocean Dumping Act regulations).

41.     Under Clean Water Act Section 404, no contaminants are categorically prohibited

from open water disposal.  If any discharge of dredged or fill contains any "toxic pollutant"

listed under Clean Water Act Section 307, 33 U.S.C. § 1317(a)(1), the discharge will be subject

to any applicable toxic effluent standard or prohibition, and will require a Section 404 permit.

The list of 65 toxic pollutants covered by the Act appears in 40 C.F.R. § 401.15.  These 65

pollutants have been subdivided into 126 "priority pollutants" for which EPA has published

analytical test methods.

42.      The Clean Water Act regulations also contemplate that dredged material

considered contaminated may still be approved for open water disposal if "[t]he effects of the

dredged or fill material after discharge may be controlled by [c]apping in-place contaminated

material with clean material or selectively discharging the most contaminated material first to be

capped with the remaining material."  40 C.F.R. § 230.72.

43.     The Ocean Dumping Act regulations applicable to open water disposal dumping

do not include any comparable provisions that would allow for capping of dredged materials that

do not meet the Ocean Dumping Act testing standards in 40 C.F.R. § 227.

44.     EPA acknowledges that Ocean Dumping Act requirements for evaluating

suitability for disposal are more extensive than those that apply under the Clean Water Act.  For

example, in explaining its position that the material to be disposed of at the Eastern Site will not

have any adverse impacts, EPA notes:

> Before any dredged material can be disposed of at any designated site such as the ELDS,
> that material will first have to be tested according to applicable regulations and related
> national and regional guidance, and will have to satisfy the applicable legal requirements.
> As stated previously, non-federal dredging projects generating less than 25,000 cy

15

(19,114 m3) of dredged material <u>are subject only to the requirements of [Clean Water Act] § 404, whereas non-federal dredging projects generating 25,000 cy or more of dredged material, and all federal projects, are subject to the requirements of both the [Ocean Dumping Act] and [Clean Water Act] § 404</u>.

SEIS, p. ES 21-22 (emphasis added).

### 3.  Citizen Suits Under the Ocean Dumping Act

45.      The Ocean Dumping Act authorizes citizen suits for violations of the Act, upon sixty days' written notice to EPA.  33 U.S.C. § 1415(g)(1).

## B.  The Administrative Procedure Act

46.      Under the Administrative Procedure Act, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; [or] without observance of procedure required by law."  5 U.S.C. § 706.  The Administrative Procedure Act defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  *Id*. § 551(13).

## C.  The Coastal Zone Management Act

47.      The Coastal Zone Management Act permits a coastal state to submit for approval its state coastal management program to the U.S. Secretary of Commerce, acting through the federal Office of Coastal Management within the National Oceanic and Atmospheric Administration. 16 U.S.C. § 1454.  The Commerce Department's approval of a state coastal program provides a federally-authorized vehicle for state regulation and protection of the land and water uses and natural resources in the state's coastal zone.  Such programs must meet certain stringent requirements to be approved.  *See* 16 U.S.C. § 1455(d); 15 C.F.R. Part 923.

48.      On September 30, 1982, the NYS Coastal Management Program was approved by U.S. Secretary of Commerce and became effective.

16

49.    In 2001, the U.S. Secretary of Commerce concurred with the incorporation of the State of New York's Long Island Sound Regional Coastal Management Program into the NYS Coastal Management Program.  The Long Island Sound Management Program includes specific enforceable policies reflecting the findings, needs, and objectives of the public interest in the Long Island Sound region.  Federal agency activities and federally-permitted activities which may affect the uses and resources of the Long Island Sound coastal area are subject to review for consistency with the coastal policies of the NYS Coastal Management Program and the Long Island Sound Management Program. 15 C.F.R. Part 930, Subparts C and D.

50.    Additionally, on March 28, 2006, the U.S. Secretary of Commerce approved the inclusion of an interstate consistency component in the NYS Coastal Management Program.  15 C.F.R. Part 930, Subpart I.  New York State demonstrated, and the U.S Secretary of Commerce agreed, that the designation and use of open water disposal sites in Connecticut waters in Long Island Sound have reasonably foreseeable effects on New York's coastal resources and uses.  As a result of this approval, the NYS Program has an expanded geographical reach in Long Island Sound that includes Connecticut's state waters to the -20' bathymetric mark depth (and Connecticut has an expanded coastal boundary for purposes of coastal program consistency review to the commensurate line in New York waters).  Accordingly, New York has jurisdiction to conduct Coastal Zone Management Act consistency review over Ocean Dumping Act § 103 dredged material dumping activities, including Ocean Dumping Act § 102 site designations, and Clean Water Act § 404 activities, in a portion of Connecticut's Long Island Sound waters, including specifically the location of the Eastern Site.

51.    On November 30, 2004, the Town of Southold, New York adopted a local waterfront revitalization program ("Southold Waterfront Program"), which has been

17

incorporated into the federally-approved NYS Coastal Management Program.  *See* New York Executive Law §§ 915 and 916; 19 N.Y.C.R.R. Part 601. The Southold Waterfront Program encompasses the entire town, including its waters in Long Island Sound, which extend to the shared border with Connecticut, as well as natural, public, and developed waterfront resources. The Southold Waterfront Program's enforceable coastal policies guide federal and state agencies in their decision-making responsibilities for activities affecting the coastal resources within the town.

52.     Once the U.S. Secretary of Commerce approves a state coastal management program, the Coastal Zone Management Act requires that all Federal agency activities that affect any land or water use or natural resource in the coastal zone be "carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies" of that program.  16 U.S.C. § 1456(c)(1)(A).  "Federal agency activities" include all activities initiated by a Federal agency that may affect coastal resources "when coastal effects are reasonably foreseeable." 15 C.F.R. § 930.31(a).

53.     The Act requires each Federal agency that proposes to carry out an activity that may affect any land or water use or natural resource in the coastal zone to provide a "consistency determination" to the designated state coastal zone management agency (here, NYSDOS) at least ninety days prior to the Federal agency's approval of the activity. 16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. § 930.36(b)(1).  The consistency determination must explain whether and how the proposed federal agency activity is "consistent to the maximum extent practicable" with the "enforceable policies" of the federally-approved state coastal management program (here, the NYS Coastal Management Program and its constituent components the Long Island Sound and Southold Programs). 15 C.F.R. §§ 930.36(a) & 930.39(a), (c), (e).

18

54.     "Consistent to the maximum extent practicable" means "fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency." 15 C.F.R. § 930.32(a)(1).  "Enforceable policies" are "[s]tate policies which are legally binding through constitutional provisions, law, regulations, land use plans, ordinances, or judicial or administrative decisions, by which State exerts control over private and public land and water uses and natural resources in the coastal zone." 16 U.S.C. § 1453(6a); 15 C.F.R. § 930.11(h).

55.     The state coastal agency has sixty days to concur, conditionally concur, or object to the Federal agency's consistency determination. 15 C.F.R. § 930.41(a).  If a state coastal agency objects to the Federal agency activity, the state and Federal agency attempt to resolve their differences within the time remaining of the initial ninety-day period.  If resolution cannot be achieved, the Federal agency may not proceed with the activity unless it finds that: 1) consistency with the enforceable policies of the state's coastal program "is prohibited by existing law applicable to the Federal agency" and the Federal agency has "clearly described, in writing, to the State agency the legal impediments to full consistency;" or 2) its proposed action is fully consistent with the state coastal program notwithstanding the state's objections.  15 C.F.R. § 930.43(d).

## FACTUAL ALLEGATIONS

### A.  Long Island Sound

56.     Long Island Sound is a semi-enclosed, tidal estuary at the interstate boundaries of New York, Connecticut, and Rhode Island.  Extending 110 miles long and up to 20 miles wide, the Sound is one of the largest estuaries along the Atlantic coast of the United States.  The New York - Connecticut boundary runs the length of the Sound through its approximate center until

19

reaching the waters of Rhode Island.  The estuary connects to the Atlantic Ocean at its eastern

end through the Race and Block Island Sound, and to New York Harbor at its western end

through the East River at Throggs Neck and the New York City municipal boundary.

57.    The Sound is surrounded by developed coastal lands, industrial activities, and a

dense human population making intensive use of its waters.  Since colonial times, Connecticut

has depended on its rivers and harbors for commerce.  Connecticut's history as the birthplace of

the industrial revolution in America left behind a legacy of heavy metal concentrations in its

rivers, bays, and harbors - a remnant of industries that were once the core of Connecticut's

economy.  Those rivers, bays, and harbors contain significant amounts of mercury, copper,

chlordane, lead, zinc, cadmium and chromium covered by layers of sediment. (Long Island

Sound Study, Toxic Contamination in Long Island Sound, *available at*

http://longislandsoundstudy.net/wp-content/uploads/2010/03/fact10.pdf).  EPA's own studies

show that the rivers and harbors contain some of the highest concentrations of contaminated

sediment in the United States.  (EPA National Sediment Quality Survey, Second Edition: The

Incidence and Severity of Sediment Contamination in Surface Waters of the United States (2004)

Tables 1, 3-10 and 3-14.)

58.    Many organic-based pollutants are present in the Sound and its tributary rivers,

including polychlorinated biphenyls (PCBs) and polynuclear aromatic hydrocarbons ("PAHs"),

which are ubiquitous components of petroleum products.  PAHs are also produced during the

combustion of organic materials such as fossil fuels.  Sources of PAHs in the Sound include

petroleum terminals, urban harbors, coal piles, and industrialized basins.  (Long Island Sound

Study, Toxic Contamination in Long Island Sound, *available at*

http://longislandsoundstudy.net/wp-content/uploads/2010/03/fact10.pdf.)

59.     A Long Island Sound Study Fact Sheet describes the effects of these contaminants

on the marine ecosystem: "Some substances in high concentrations can kill marine life.  Other

substances have a more subtle effect on marine life in terms of behavior, reproduction, or how

they impact the key components of intricately balanced food webs.  The net result could be a

reduction in productivity and an imbalance in marine life communities towards pollution tolerant

species such as the opportunistic benthic worm Capitella."  (Long Island Sound Study, Toxic

Contamination in Long Island Sound, *available at* http://longislandsoundstudy.net/wp-

content/uploads/2010/03/fact10.pdf)

60.     Due to siltation, Connecticut's river bottoms and embayments must be periodically

dredged.  The Army Corps' historic practice has been to authorize this dredging and to permit or

participate in the dumping of the dredged material into the open waters of Long Island Sound.

The areas of New York with Sound coastline - Long Island, New York City, Westchester

County, and Fishers and other islands in Suffolk County - have far fewer rivers and consequently

less sedimentation.

61.     Before 1980, at least nineteen open-water placement sites were active in Long Island

Sound.  Since that time, dredged material has been placed predominantly at four open water

disposal sites -- the Western Site (then called WLIS), the Central Site (then called CLIS), the

Cornfield Shoals Disposal Site, and the New London Disposal Site (the "New London Site").

62.     In March 1988, EPA designated Long Island Sound as an Estuary of National

Significance under § 320 of the 1987 Clean Water Act Amendments, 33 U.S.C. § 1330, with the

goal of protecting and restoring the estuary.  Estuaries are some of the most productive

ecosystems on earth.  They provide habitat for multitudinous aquatic and avian species. (*See*

National Oceanic & Atmospheric Admin., Why are Estuaries Important?  The Economy and

Environment, *at* http://oceanservice.noaa.gov/education/kits/estuaries/
estuaries02_economy.html).

63.    As an estuary, Long Island Sound is freely connected to ocean waters and is measurably diluted with freshwater from runoff.  More than seventy-five rivers and streams draining a watershed greater than 16,000 square miles flow into the Sound.  Eighty percent of freshwater inflow arrives from three rivers in Connecticut: the Thames, Connecticut and Housatonic.

64.    The Sound was historically one of the most productive estuaries in the nation.  In 1991, the U.S. Fish and Wildlife Service characterized the regional setting as "historically renowned for its rich fisheries, abundance of waterfowl, diverse wildlife, productive marshes, scenic beaches, and outstanding recreational opportunities." (Northeast Areas Study 1991 *at* https://nctc.fws.gov/Pubs5/necas/begin.htm.)

65.    Commercial and recreational fishing have been an integral part of the history and economy of Long Island Sound.  More than forty-five species of finfish, crustaceans, and shellfish have been caught in the Sound, with commercial efforts concentrated on lobsters, surf clams, butterfish, Atlantic mackerel, herring, flounders, squid, and porgy.  Commercial lobstering and finfishing once represented significant sectors of local economies along the Sound.

66.    However, commercial fishing of most marketable species has declined or ended. In the past two decades, and there have been steady declines in the harvest of most commercially viable species: winter flounder, American lobster, eastern oyster, scallop, blue crab, hard clams, Atlantic surf clam, blue mussel, and horseshoe crabs.  New York State has economically suffered due to the reduction of marketable seafood from the Sound.  This decline is detailed in a

Programmatic EIS ("PEIS") that was prepared for the Long Island Sound Dredged Material

Management Plan.  (*See* PEIS pp. 4-53, 4-123 through 4-131.)

      67.    Water pollution is partially responsible for this decline.  The Sound floor contains

concentrations of heavy metals, toxic organic carbon, and other contaminants.  In 1995, the

"growing environmental degradation" of Long Island Sound prompted the United States

Geological Survey ("USGS") to undertake a multi-disciplinary study of the environmental

conditions and the geologic processes that influence these conditions in the Sound.  Since the

1980s, the USGS Coastal and Marine Geology Program has comprehensively studied the Long

Island Sound environment and has documented heavy metal contamination.  Through its Long

Island Sound Environmental Studies program, the USGS has focused on contaminants and

accumulation in sediments of the Sound.  Large striped bass and bluefish caught in Long Island

Sound during 2006-2007 contained mercury concentrations exceeding the U.S. Food and Drug

Administration (FDA) human health action level of 1 mg/kg wet weight (Skinner, et al., 2009).

This pollution, along with other ecological stressors, has negatively impacted the marine coastal

economy dependent upon fishing, shellfishing, and seafood processing.

      68.    USGS reported that sediments in Long Island Sound "are a sink for wastes and

contaminants from various sources such as riverine input, wastewater treatment plants, urban and

agricultural runoff, and sediment and waste disposal."  (U.S. Geological Survey Studies in Long

Island Sound: Geology, Contaminants, and Environmental Issues, *at*

http://woodshole.er.usgs.gov/project-pages/longislandsound/overview.html.)  Due to the

significant human population, the Sound is used heavily and its sea floor has been negatively

impacted by human activities.

**B. Permanently Designated Disposal Sites in and Around the Sound Before the Eastern Site Designation**

69.     EPA designated the Rhode Island Site as a permanent disposal site in 2005. EPA then designated the Western and Central Sites on July 7, 2016 as permanent dredged material disposal sites.  The Eastern Site is the third permanent disposal site that EPA designated in the Sound in 2016 pursuant to Section 102 of the Ocean Dumping Act, with an effective date of January 5, 2017.

### 1.     The Rhode Island Sound Disposal Site

70.     The Rhode Island Sound permanent dredged material disposal site is located in the Atlantic Ocean approximately 7.5 nautical miles east of the northern end of Block Island, Rhode Island, 31 nautical miles from the eastern entrance to the Long Island Sound, and 44 nautical miles from the New London Harbor.  It is 1 square nautical mile in area, and is from 115 to 128 feet deep, with an average depth of 122 feet. A total of 5,300,000 cy of dredged material has been placed at this site since 2003, and it has an estimated remaining capacity of 16.5 to 19.5 million cy ("mcy").  (Army Corps, Long Island Sound Dredged Material Management Plan (Dec. 2016), section 4.9.4, p. 4-31.)

### 2.     The Western and Central Long Island Sound Disposal Sites

71.     EPA began the process of designating the Western and Central Sites in April 2004, publishing an environmental impact statement recommending their designations under Section 102 of the Ocean Dumping Act.  NYSDOS objected to EPA's proposed designation of the two sites as being inconsistent with the State's coastal program policies under the Coastal Zone Management Act.  On May 15, 2005, NYSDOS conditionally withdrew its objection to the consistency of the EPA's temporary designations of these sites, in return for the insertion of

certain terms and conditions in a proposed EPA rule that were intended to reduce or eliminate the disposal of dredged materials in Long Island Sound.

72.     On June 3, 2005, EPA published a revised rule designating the Central and Western Long Island Sound ocean disposal sites for temporary use.  EPA's 2005 Rule directly linked the continued use of these two open water disposal sites to the preparation and completion of a regional Long Island Sound Dredged Material Management Plan ("DMMP"), with the "goal of reducing or eliminating the disposal of dredged material in Long Island Sound" in favor of alternatives to open-water disposal.  70 Fed. Reg. 32498-01 (June 3, 2005); 40 C.F.R. § 228.15(b)(4)(vi)(C) [2005].

73.     In December 2015, some ten years later, the Army Corps finalized the DMMP.  In January 2016, EPA submitted a consistency determination to NYSDOS under the Coastal Zone Management Act, stating that designating the Western and Central Sites as permanent dredged material disposal sites would be consistent with the NYS Coastal Management Program.  On April 15, 2017, NYSDOS issued a conditional concurrence in response to the EPA's consistency determination. NYSDOS's decision included restrictions and conditions, reached in agreement with EPA, on the use of the sites that focused on the goal of reducing or eliminating the disposal of dredged materials into Long Island Sound.  EPA included such restrictions and conditions in its final rule designating the Western and Central Sites on July 7, 2016.

74.     The Western Site is a 1.52 square nautical mile (1.2 by 1.3 nautical miles) rectangular disposal area that has been used for dredged material disposal since l982.  The site is located approximately 2 nautical miles north of Huntington, New York and 2.5 nautical miles south of Darien, Connecticut.  Water depths at the Site range from 79 feet to 118 feet below

mean sea level.  (EPA, Final Environmental Impact Statement for the Designation of Central and Western Sites (March 2004), Executive Summary, p. ES-4, hereinafter "FEIS 2004")).

75.     Between 1982 and 2014, the Western Site received approximately 1.9 mcy of dredged material.  According to the DMMP (p. 4-25), the site has a remaining long-term capacity of at least 20 mcy.

76.     The Western Site is located approximately 59 nautical miles west of New London Harbor. (Eastern Site Rule, 81 Fed. Reg. 87820, 87822 (Dec. 6, 2016)).

77.      The Central Site, formerly known as the New Haven Disposal Site, covers a 2.42 square nautical mile area (1.1 by 2.2 nautical miles).  It is situated 5.6 miles south of South End Point, East Haven, Connecticut.  (DMMP, p. 4-27.)  Water depths at the site range from 59 feet to 74 feet below mean sea level.  (FEIS 2004, p. ES-5.)

78.     Historically, the Central Site has been one of the most active disposal sites in the New England region.  Between 1941 and 2004, the site received close to 14 million cy of dredged material.  (DMMP, p. 4-27.)  Sediments deposited there were dredged from New Haven, Bridgeport, Stamford, and Norwalk Harbors, as well as other adjacent coastal areas.

79.     The 2004 environmental impact statement issued by EPA concerning the designation of the Central Site noted that the Army Corps had estimated remaining site capacity of the Site to be 38 mcy.  (FEIS 2004, Appendix J-2 CLIS-SMMP, p. 64.)

80.     The Site Management and Monitoring Plan for the Central Site issued by EPA and the Army Corps in March, 2016 ("CLDS-SMMP"), estimated the site to have a remaining capacity of 36 mcy:

> The estimated site capacity of CLDS was estimated by the [Army Corps] as 38 million cubic yards in the 2004 EIS (EPA, 2004). This estimate was calculated as the volume between the seafloor and a depth of 46 feet below MLW, assuming a mound with a side

slope of 1:10 (EPA, 2004). From 2005 to 2014, approximately 2.4 MCY have been
disposed of at CLDS, leaving an estimated 36 MCY in remaining capacity.

CLDS-SMMP, Site Capacity p.11.

81.     In sharp contrast to this reasonable calculation of the remaining capacity at the

Central Site, EPA asserted, in justifying its designation of the Eastern Site, that the Central Site

had a purported remaining capacity of only 20 mcy.  The unexplained disappearance of 16 mcy

of available capacity at the Central Site had the effect of materially inflating the purported need

for additional disposal capacity in the eastern Long Island Sound area by that same amount.

82.     The distance from New London Harbor to the Central Site is 34.7 nautical miles.

83.     Over the years, a number of projects in the eastern Long Island Sound area have

applied for approval to use the formerly active New London Site (located next to the Eastern

Site), but NYSDOS objected to further disposal at that site pursuant to the Coastal Zone

Management Act.  Those projects subsequently disposed of dredged material from the eastern

Sound at the Central Site, with approval by the Army Corps and EPA.  In at least one instance,

the Corps disposed of 250,000 cy of dredged material from the eastern Long Island Sound area at

the Central Site.  Recent projects that disposed of dredged material from the eastern Sound area

at the Central Site include (by sponsor, area dredged, federal consistency file designation, and

amount of material disposed of): (a) Gwenmor Marina, Stonington, Ct., federal designation F-

2014-0047, 17,000 cy of dredged material; (b) Army Corps dredging of 250,000 cy of dredged

material from the Mystic River Federal Navigation Project, Groton and Stonington, Ct., F-2014-

0803; (c) Town of Stonington, Ct., F-2014-0803, 6,340 cy of dredged material from the

Secondary Auxiliary Channel, Upper Mystic Harbor; Spicer's Marina, Noank, Ct., F-2014-0823,

16,000 cy of dredged material; (d) Mason Island Landing, LLC, Stonington, Ct., F-2014-0434,

13,238 cy of dredged material; (e) Pine Island Marina, Groton, Ct., F-2014-0435, 21,545 cy of

dredged sediments; and (f) United States Navy, F-2009-0645, 230,000 cy of dredged material from the Thames River.

84.     These disposals of dredged materials from the eastern Long Island Sound area at the Central Site demonstrate the feasibility of disposing of dredged materials from that area at a designated disposal site other than the Eastern Site.

## C.  EPA's Selection and Designation of the Eastern Site as a Permanent Disposal Area

### 1.  EPA's Rulemaking Process

85.     On October 16, 2012, EPA issued a Notice of Intent to prepare an SEIS to evaluate the potential designation of one or more open water disposal sites to serve the eastern Long Island Sound region of Connecticut, New York, and Rhode Island.  77 Fed. Reg. 63312 (2012).  The Notice of Intent stated that the SEIS would "update and build on the analyses that were conducted for the 2004 Long Island Sound EIS," and would "evaluate the two then-current sites used in eastern Long Island Sound as well as other sites for, and means of, disposal and management, including the no action alternative."

86.     As part of its evaluation, EPA designated a "zone of siting feasibility" as the area within which it would be considering designating a permanent site.  The western end of the zone followed a line from Guilford, Connecticut to Mattituck on the north shore of Long Island.  The northern side of the zone extended from Guilford east to Point Judith, Rhode Island, at the southwest corner of Narragansett Bay, with the eastern end of the zone extending southeast from Point Judith, Rhode Island to Montauk Point, New York.

87.     On April 27, 2016, EPA published a proposed rule concerning designation of one or more permanent dredged material disposal sites in Eastern Long Island Sound, which announced that the agency's "preferred alternative" was a location called the Eastern Long

Island Disposal Site that comprised 50% of the western portion of the historical New London

Site, plus two undisturbed areas immediately to the west, referred to by EPA as "Site NL-Wa"

and "Site NL-Wb."

88.    EPA accepted public comments on the proposed rule from April 27 through July

18, 2016, holding public hearings on May 25 and 26, 2016.

89.    Among other comments, a representative of the Town of Southold, New York,

asked EPA whether the standards and testing criteria to determine suitability of dredged material

for disposal at the proposed Eastern Long Island Disposal Site would differ for non-federal

projects (subject only to Clean Water Act suitability criteria) and federal or private projects of

greater than 25,000 cy (subject to Ocean Dumping Act criteria).  EPA responded:

> According to the commenter, it is not clear in the DSEIS that the sampling protocol is
> sufficient for sediments from non-federal facilities.  The commenter asks if the protocols
> are the same for non-federal and federal projects.  The commenter urges that non-federal
> projects should arrange disposal in upland beneficial sites where their impacts can be
> contained, and not adversely affect waterways and natural resources. …
>
> The commenter expresses concern that material from smaller non-federal dredging
> projects might still be placed in open water with management steps under Section 404 of
> the Clean Water Act (CWA), despite the material's potential to cause adverse impacts.

FEIS, Response to Comments on Draft SEIS and Proposed Rule, p. 85.

90.    EPA's response to these comments ignored the specific question of whether

smaller private projects would be subject to the stringent evaluation provided for under the

Ocean Dumping Act.  Instead, EPA merely recited what the Ambro Amendment provides,

namely that:

> The sediments from all projects subject to [Ocean Dumping Act] requirements are
> assessed under the same protocols whether they come from federal or non-federal
> projects.  Under Section 106(f) of the [Act], the requirements of the statute apply to
> dredged material disposal in Long Island Sound from all federal projects and from private
> projects involving more than 25,000 cubic yards of material.  USEPA believes that these

29

protocols are sufficient.  For non-federal dredged material disposal projects involving 25,000 cubic yards or less, Section 404 of the [Clean Water Act] applies.

SEIS, Response to Comments on Draft SEIS and Proposed Rule, p. 86.  EPA's response also conceded that the requirements for disposal suitability under the Clean Water Act and Ocean Dumping Act do in fact differ and suggested that the Clean Water Act standards are purportedly "still rigorous;" by claiming that: "Non-federal projects involving 25,000 cubic yards of material or less are still subject to the requirements of Section 404 of the Clean Water Act (CWA) and 40 C.F.R. Part 230.  These requirements are not entirely the same as the [Ocean Dumping Act] requirements, but they are still rigorous, and provide a forum for issues to be raised."  *Id.* at 88.  EPA did not address in the SEIS the specific question of how the standards differ or whether environmental harm might result from the difference in standards.

91.    On July 18, 2016, NYSDOS and NYSDEC submitted comments to EPA asserting that designation of a Long Island Sound disposal site in the eastern basin was not necessary to accommodate projected open water disposal needs for the Sound, but that if designation of such a site was unavoidable, then EPA should designate the historically used Niantic Bay Site, specifically evaluated as an alternative in the SEIS, as the eastern location.  With respect to need, the agencies wrote:

> The primary justification provided by the EPA and Army Corps for an eastern Long Island Sound dredged material disposal site is based on the assertion that there is inadequate capacity at the Western Long Island Sound (WLIS), Central Long Island Sound (CLIS) and Rhode Island Sound (RISDS) sites.  Our review of the estimates has yielded a much different conclusion.  Based on our analysis of the information in the DMMP, over the next 30 years there is anticipated to be approximately 34.4 million cubic yards (mcy) of fine-grained dredged material suitable for open water disposal, well within the current stated capacity at the Central and Western sites of 40 mcy. This is in addition to the approximately 3 mcy cubic yards of unsuitable material and approximately 15 mcy of coarse-grained material suitable for beach nourishment and other beneficial uses that comprises the remainder of the estimated 52.9 mcy to be dredged in LIS over the next 30 years.

30

92.     The New York agencies added that if, contrary to this evidence, designating an eastern site were shown to be necessary and substantively defensible, then "Niantic [Bay] has been historically impacted by dredged material disposal in the past and selecting this site would better limit impacts to areas previously impacted."

93.     Additionally, the New York agencies stated in their comments that the proposed Eastern Long Island Disposal Site was worse than the Niantic Bay Site because the proposed Eastern Site was "on top of vessel traffic lanes."[1]

94.     When EPA responded to the New York agencies' comments, EPA did not mention the heavy Cross Sound Ferry traffic through the proposed Eastern Site at all, instead discussing a different and unrelated navigation channel crossing the former New London Site to the east of the Eastern Site. [2]

95.     On October 3, 2016, the New York Secretary of State issued an objection to EPA's consistency determination, asserting inconsistency with specific policies contained in the Long Island Sound and Southold Waterfront Programs.

96.     On November 4, 2016, EPA issued its final rule designating the Eastern Site as a permanent disposal site under Section 102 of the Ocean Dumping Act.  The final rule modified the boundaries of the previously contemplated Eastern Long Island Sound Disposal Site, as described in the April 27, 2016 draft rule, to exclude the western portion of the previously used New London Disposal Site, so that the final configuration of the Eastern Site consists solely of the previously unused NL-Wa and NL-Wb portions of the draft proposed site.  EPA projected

---

[1] SEIS, Appendix J, J-2-27.
[2] SEIS, Appendix J, p 58.

that the Eastern Site as designated can accommodate approximately 20 mcy of dredged material disposal.

97.     The final rule and supporting SEIS concluded that with proper monitoring and management in accordance with its site management plan, use of the Eastern Site "will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities."  (SEIS, p. ES-21.)

98.     A recurring point underlying EPA's findings and analysis was that only dredged material deemed "suitable" for open water disposal under the stringent Ocean Dumping Act criteria would be permitted.  However, EPA did not analyze the environmental impacts on the Sound of dumping significant quantities of dredged materials at the Eastern Site that would be subject only to the Clean Water Act criteria.  This rendered the agency's compliance with certain Ocean Dumping Act siting regulations defective, undermining its analysis of cumulative and other impacts.  For example, in addressing sediment quality, the SEIS noted that "dredged material would have to satisfy the sediment quality criteria of USEPA's ocean disposal regulations before it would be approved for open-water disposal.  Therefore, adverse effects to sediment quality as a result of dredged material disposal are not likely at any of the alternative sites."  (SEIS, p. ES-11; p. 5-33) (all dredged material disposed of at the Eastern Site "would have to satisfy the sediment quality criteria of USEPA's ocean disposal regulations [40 C.F.R. Part 227] before it would be approved for open-water disposal.").

99.     EPA similarly based its analysis of cumulative impacts on the assumption of universal evaluation for suitability under the stringent Ocean Dumping Act standards.  EPA's finding in the SEIS of no cumulative impact based on the assumption that all future disposals would be deemed suitable under the stricter Ocean Dumping Act standards glossed over the

potential introduction of contaminated sediments from private projects under 25,000 cy.  (SEIS, Section 5.7)

100.    The SEIS findings did not address that disposal of dredged materials from private dredging projects of less than 25,000 cy – potentially up to almost 44% of the dredged materials to be generated in the eastern Sound - would not be subject to the Ocean Dumping Act criteria, but rather the less stringent criteria under the Clean Water Act.

101.    The New York agencies commented that a third site in Long Island Sound was not needed based on the projected disposal data.  The Sound DMMP estimated an overall projected need to dredge 52.9 mcy, but estimated that 3.3 mcy of that material was unsuitable for open water disposal, leaving 49.6 mcy of dredged material proposed for open-water disposal. EPA's response and justification also cited the Sound DMMP figure of 49.6 mcy as the total projected need for open water dumping capacity in the Sound.  Following what it termed a "conservative" approach, EPA in the SEIS estimated that the Western and Central Sites each had approximately 20 mcy of remaining capacity, thereby leaving an estimated need for an additional 9.6 mcy of capacity. EPA conceded that "it is likely that beneficial uses, or some other upland management option, will be found for some amount of sand, and even some amount of fine-grained materials, but there is no guarantee of this and it is impossible to be sure in advance what these amounts will be." 81 FR 87820, 87825 (Dec. 6, 2016).

102.    On November 4, 2016, EPA responded to NYSDOS's Coastal Zone Management Act objection.  EPA asserted that the Eastern Site was consistent to the maximum extent practicable with the enforceable coastal policies of the NYS Coastal Management Program.

103.    On December 6, 2016, EPA published the final rule in the Federal Register.  81 Fed. Reg. 87820.  That same day, NYSDOS and NYSDEC sent EPA a notice letter pursuant to

Ocean Dumping Act Section 105(g), 33 U.S.C. § 1415(g), informing EPA of their intent to bring an action to seek redress for its violations under the Ocean Dumping Act.

104.    EPA's final rule became effective on January 5, 2017.

105.    On August 2, 2017, NYSDOS and NYSDEC sent EPA another notice letter pursuant to Ocean Dumping Act Section 105(g), 33 U.S.C. § 1415(g), informing EPA of their intent to bring an action to seek redress for violations under the Ocean Dumping Act additional to those identified in their December 6, 2016 notice letter.

106.    On August 17, 2017, Rossana Rosado, as New York Secretary of State, Basil Seggos, as Commissioner of the NYSDEC, and the State of New York commenced this action by filing a summons and complaint.

## 2. EPA's Analysis of Need for a Third Open Water Disposal Site in Eastern Long Island Sound

107.    The Ocean Dumping Act requires EPA to consider the "need" for an open water disposal site when it engages in rulemaking to designate such a site.  EPA's estimation of overall need for dredge disposal capacity in the Sound was central to this analysis.

108.    EPA relied on data in the Army Corps' DMMP in determining the need for a third permanent disposal site in the Sound.

### a. EPA's Baseline Estimate of Total Disposal Capacity Needed for the Sound

109.    The Army Corps' DMMP estimated the amount of open water disposal capacity needed in the Sound over thirty years.  In arriving at that estimate, the Army Corps compiled a list of anticipated projects in and around the Sound that would generate dredged materials, examined the nature and quantity of the resulting materials from the various projects, and evaluated the disposal options likely to be deemed appropriate for these materials.

34

110.   As depicted in the chart below, the Corps estimated that the total amount of material dredged throughout Long Island Sound over the next thirty years would be 52,890,300 cy.  The chart below reflects the Corps' estimations of how many cubic yards would be unsuitable (meaning too contaminated to meet the requirements in the Ocean Dumping Act and Clean Water Act) for open water disposal.  Similarly, the chart contains the Corps' estimates of how many cubic yards was expected to be suitable for open water disposal and how much was expected to be course-grained sand appropriate for placement on beaches or berms.  (DMMP, pp. ES-7 through ES-8.)

| | |
|---|---|
| Total amount projected to be dredged in the Sound over 30 years: | 52.9 million cy[3] |
| Minus material unsuitable for open water disposal: | -3.3 million cy[4] |
| **Equals total projected need by EPA for open water dumping capacity in the Sound:**<br><br>49.9 million cy includes:<br>• course-grained material suitable for beach nourishment:<br>• fine-grained material not suitable for beach nourishment: | **49.6 million cy**<br><br><br>15.5 million cy[5]<br>34.4 million cy |

**b.   EPA's Factoring of Disposal Capacity at Already Designated, Historically Used Sites Into its Determination of Need**

111.   In determining the capacity needed for open water disposal in the eastern Sound basin, EPA examined the available capacity at other historically used, designated sites.  EPA estimated that both the Western Site and the Central Site have 20 mcy remaining.  Yet, federal

---

[3] DMMP Table 4-1 (p. 4-12 and 4-13) projected that 52,890,300 cy would need to be dredged in the Long Island Sound Region over the next thirty years.
[4] Id. DMMP projected that 3,303,600 cy was unsuitable.
[5] Id. DMMP projected that 15,497,000 cy would be course-grained sand that would be appropriate for placement on beaches or berms.

records estimate that 36 mcy of capacity remains at the Central Site, as explained in the

following chart:

| | Western Site | Central Site | Rhode Island Site |
|---|---|---|---|
| **2004 Capacity Calculations** | 20 million cy[6] | 38 million cy[7] | -- |
| **Dredged Material Disposals 2004-2016** | - 1.1million cy[8] | -3.6 million cy[9] | -- |
| **Estimated Total Remaining Capacity:** | **18.9 million cy** | **34.4 million cy\*** | **16.5 – 19.5 million cy** |

*The DMMP (p. 4-27; 5-83) and SEIS (p. ES-3; ES-20) stated that the Central Site had capacity for only **20 million cy**, without accounting for the other 14.4 million cy of available capacity.

---

[6] Source: FEIS (2004) Appendix J-1 Site Monitoring/Management Plan for Western Long Island Sound using data from the Army Corps, New England District. (2003j) p. 56.

[7] Source: FEIS (2004) Appendix J-2 Site Monitoring/Management Plan for Central Long Island Sound, using data from the Army Corps, New England District (2003k) and CLDS- Site Monitoring/Management Plan (2016) at p. 11.

[8] Source: LIS DMMP p. 4-25: "WLDS collectively received over 1.9 million cubic yards of material from 1982 to 2014 with an average annual placed volume of 85,000 cubic yards."  13 years x 85,000 cy = 1,105,000 cy.

[9] Source: EPA compiled annual reports detailing the amount of dredged materials disposed of at the Central Site for the years 2006 through 2014. The total for that period was 2,646,576 cy, for an average annual amount of 294,064 cy.  Adding that annual average to account for the year 2005 (294,064 cy) to totals maintained by NYS DOS and the Corps showing that in 2015 and 2016 permits were issued to dump between 274,593 and 360,498 cy of dredged materials at CLDS, the approximate amount disposed of at the Central Site between the period 2004 and 2016 totaled **3,575,731 million cy**.  *See* EPA, Annual Reports Regarding Progress in Developing a Dredged Material Management Plan for the Long Island Sound Region, *at* https://www.epa.gov/ocean-dumping/annual-reports-regarding-progress-developing-dredged-material-management-plan-long.

As noted in the chart above, according to EPA's own records, at the time of EPA's analysis Western and Central alone had a combined capacity of 53.3 mcy (18.9 mcy + 34.4 mcy), which will be more than sufficient capacity to handle all of the dredged materials that had been planned for open water disposal in the Sound over the next thirty years. And when considered together with the Rhode Island Site, the total capacity increases to a minimum of 69.8 mcy.

112.   EPA did not explain how it concluded the Central Site had only 20 mcy remaining. It did however scientifically explain how it arrived at 38 mcy capacity at the Central site. (*See* calculations at ¶ 80.)

      c.  **Anticipated Use of Coarse-Grained Material for Beach Nourishment and Other Beneficial Uses Will Further Reduce the Need for Open Water Disposal in the Sound, a Fact that EPA Did Not Factor Into its <u>Determination of Need</u>**

113.   Even if EPA were correct in its conclusion that the combined capacity of Western and Central was only 40 mcy, there would still be sufficient capacity for the dredged materials due to the large amount of material that should be used for beach nourishment and other beneficial use projects.

114.   Although EPA included all of the 15.5 mcy of sand in its baseline estimate of 49.6 mcy of overall open water disposal capacity needed for the Sound, recent dredging projects and EPA's own more refined site-specific analyses indicate that most of the sand will be used for beach nourishment and therefore not dumped.

115.   A recent example is illustrative. One of the projects areas identified in the DMMP is the dredging of the navigation channel of the Housatonic River in and around Milford and Stratford, Connecticut.  The DMMP anticipates that dredging of the Housatonic will generate 1.4 mcy of suitable sand, and 455,500 cy of suitable fine grained organic sediment over the next thirty years.  (DMMP, p. 4-12.)  That 1.4 mcy total is included in the 49.6 mcy total EPA used to

determine the amount of open water disposal capacity needed for the Sound.  Recently the

Connecticut Port Authority announced that dredging 300,000 cy of material from the Housatonic

will take place during the 2017-18 dredging season.  All 300,000 cy of material to be dredged

will be sand and all the sand will be shipped approximately 29 nautical miles to Hammonasset

Beach State Park in Madison, Connecticut for beach and shoreline replenishment.

116.   Further, in its Final Rule designating the Eastern Site, EPA itself concluded that

88% of the coarse-grained sand materials would be headed for beach nourishment when it

elaborated on the numeric basis for its projected need for an additional 20 mcy of capacity in the

eastern basin of the Sound.  EPA included in its "conservative approach":

> [T]he need to accommodate approximately 12.5 mcy of suitable fine-grained sediment;
> 2.8 mcy from potential improvement (deepening) dredging projects; 1.8 mcy of shoal
> material resulting from extreme storm events; *1.1 mcy of sand  (recognizing that beach
> nourishment may not be a practicable alternative for all 9.1 mcy of the projected sand)*;
> and 160,000 cy for the excavation of Confined Aquatic Disposal cells (for material
> unsuitable for open-water disposal); for a total of 18,364,500 cy; and a bulking factor of
> approximately 10 percent of the total, which brings the total to about 20 mcy.

81 Fed. Reg. at 87824 (emphasis added). Thus, with respect to this specific site, EPA assumed

that 12% of the dredged sand would require open water disposal (1.1 mcy out of 9.1 mcy), and

that 88% would be used for beach nourishment.

117.   If this same percentage were applied to the 15.5 mcy of sand in the EPA estimate

of total dredged material to be generated in and around the Sound, then the 52.9 mcy would be

reduced to 36.65 mcy of material likely to require open water disposal, which is well within the

combined 53.3 mcy capacity of the Western and Central Sites.  Even if EPA were correct in its

conclusion that the combined capacity of Western and Central was only 40 mcy, there still would

be sufficient capacity at these existing sites.

118.    Sea level rise, increasingly frequent intense storm events, and the need for coastal resilience projects like the Hammonasset Beach State Park in Madison, Connecticut, will increase the demand for sand and coarse-grained sediments for beach nourishment.

119.    Therefore, in determining the need for a third disposal site in the Sound, EPA relied on inaccurate totals of the available capacity remaining at previously designated sites, did not appropriately consider that a large percentage of the dredged materials would be used for beach nourishment and other beneficial use projects, and also did not consider the remaining 16.5 to 19.5 mcy capacity available at the already designated, historically used Rhode Island Site.

120.    The final rule additionally attributed EPA's decision to designate a permanent eastern Long Island Sound disposal site to concerns about the environmental impacts, safety issues, and costs of longer shipping distances to the three already designated, historically used sites in or near the Sound.  81 Fed. Reg. at 87826.

**3. EPA's Analysis of Interference with Navigation**

121.    As noted above in paragraph 27, Ocean Dumping Act regulations require that disposal sites be selected to "minimize the interference of disposal activities with other activities in the marine environment", including "avoiding . . . regions of heavy commercial . . . navigation," 40 C.F.R. § 228.5(a).

122.    The regulations also require EPA to consider interference with "shipping . . . and other legitimate uses of the ocean" when evaluating whether to make such designations, 40 C.F.R. § 228.6(a)(8).

123.    The Eastern Sound in and around New London Harbor is a region of heavy commercial navigation.  It is traversed by a number of corridors of commercial navigation, including a designated marine transportation corridor.[10]

124.    New London Harbor, immediately north of the Eastern Site, is one of Connecticut's busiest harbors.

125.    In the SEIS, citing a data report from the Corps, EPA states that there were 6,727 vessel and barge trips "to and from" New London Harbor in 2012.[11]

126.    EPA reported only half of the traffic in and out of the harbor; the Corps data report states that there were 6,727 "Upbound" trips and 6,702 "Downbound" trips in the harbor in 2012.[12]  Moreover, based on its current schedule, the Cross Sound Ferry alone enters or exits New London Harbor about 14,975 times per year.  (The Ferry runs every half hour during the summer months, and every hour during the winter months, with no service on Christmas Day.)

127.    The Cross Sound Ferry is an important link in interstate commerce.  It provides a significant service to the people of New York and others, as it provides a time-saving travel link between Long Island and New England while avoiding the longer driving route through the congested New York City area.

128.    The Cross Sound Ferry carried 1,099,820 passengers and 425,000 autos in 2013, and 1,216,000 passengers and 462,000 automobiles in 2014.[13]

---

[10]  SEIS, pp. 4-146 to 4-150.

[11]  SEIS, p. 4-147

[12]  *See* USACE, Waterborne Commerce of the United States.  Calendar Year 2012.  Part 1 – Waterways and Harbors Atlantic Coast, Freight Traffic and Trips and Drafts, page 163, available at http://www.navigationdatacenter.us/wcsc/pdf/wcusatl12.pdf.

[13]  Gene Kosoy, *et al.*, The Future of NYS Ferry System (Nov. 15, 2016), *available at www.utrc2.org/sites/default/files/Kate-Lawson-Presentation.pdf.*

129.   The route of the Cross Sound Ferry traveling in both directions crosses directly over the Eastern Site.

130.   Automatic Identification System data for 2012 from the U.S. Coast Guard confirm the Cross Sound Ferry's frequent trips through the Eastern Site, showing a high commercial vessel density along its route between New London and Orient Point.  *See* the following figure, which NYSDOS generated from U.S. Coast Guard data:



131.   EPA's analysis of the impact of the commercial traffic in the SEIS through the eastern Sound failed to consider the total amount of navigation in the region, and, in particular, failed to consider the magnitude of the extensive ferry traffic that crosses the Eastern Site.

132.   In its analysis leading to the designation of the Eastern Site, EPA selected certain considerations as "Tier 1 criteria" that would serve as a basis to exclude areas from consideration as potential disposal sites.[14]

133.   In 2013, EPA identified ship traffic density and commercial vessel navigation, including ferries, as a Tier 1 screening criterion.[15]  Although the New London/Orient Point Ferry crosses the Eastern Site, EPA failed to identify and exclude this location based on application of this Tier 1 criterion.

134.   A 2013 presentation by an EPA consultant identified "ferry traffic" to Orient Point, New York as a factor militating against designating a disposal site near Orient Point.[16]

135.   EPA later, however, removed commercial ferry traffic from the Tier 1 screening criteria, stating that "vessel traffic . . . was less of a concern for the selection of alternative [open water disposal sites] given the open water conditions in the [proposed regions of the Sound] and the generally short time duration that dredged material transport barges would be present at a site during dredged material disposal."[17]  EPA also indicated that interference with commercial navigation would be mitigated through unspecified "appropriate site management practices and notice to mariners."[18]

136.   EPA included some analysis of commercial vessel traffic in the SEIS, but none of the three final sites were considered for elimination based on such traffic.[19]

---

[14] SEIS, Appendix B, p.11.
[15] SEIS, Appendix A-6, p. 3.
[16] SEIS, Appendix B, Alternative Site discussion, p. 4. Alternative Site Discussion Orient Point.
[17] SEIS, Appendix B, p. 11.
[18] SEIS, pp. ES-17 and 5-67.
[19] SEIS, pp. 4-146-150.

137.   Moreover, while the SEIS acknowledges that the Cross Sound Ferry route crosses over the Eastern Site, the SEIS figures showing marine traffic density omit the high commercial vessel traffic density resulting from the New London/Orient Point ferry.  (They do include the lesser commercial vessel traffic density resulting from the Old Saybrook/Plum Island and Point Judith/Block Island ferries.)  *See* Figure 4-48 from the SEIS and Figure 6 of Appendix B of the SEIS, [20] which follow.



**Figure 4-48.**  Marine transportation routes, anchorage areas, and density of commercial vessel traffic (Data Sources:  U.S. Coast Guard, 2012, and NOAA GIS data base).

---

[20] SEIS, p. 4-147 and Appendix B, p.11.



**Figure 6.** Density of commercial vessel traffic, marine transportation routes, and anchorage areas in the ZSF. (Data Sources: U.S. Coast Guard, 2012; NOAA, 2013a).

138. NYSDOS and NYSDEC raised the issue of the proposed Eastern Site as being "on top of vessel traffic lanes" in a July 2016 comment letter to EPA.[21]

139. When EPA responded to those comments in EPA's response to comments document, EPA discussed a navigation channel crossing the former New London Disposal Site to the east, and not vessel traffic through the Eastern Site as finally designated.

---

[21] SEIS, Appendix J, p. J-2-27.

140.    EPA did not respond to potential navigational impacts relating to the Cross Sound Ferry lane traffic between New London, Connecticut and Orient Point, New York that crosses through the Eastern Site.[22]

**D.  Harm to New York from the Designation of the Eastern Site**

141.    Disposal of dredged materials at the Eastern Site will result in the smothering of a previously undisturbed, 1.3 square nautical mile site near New York's boundary, with sediments excavated primarily from tidal river areas and bays along Connecticut's coast.  The Eastern Site is within an area of the Long Island Sound over which New York has federally approved Coastal Zone Management Act jurisdiction.

142.    The Long Island Sound's ecosystem is currently shielded from contaminants buried in coastal bays, rivers, and harbors because they are buried.  Dredging of those contaminants will expose the Sound's ecosystem to their potential impacts.

143.    Placement of the newly excavated contaminants on the floor of the Sound at the Eastern Site will create the potential for introduction of those contaminants into the food chain, allowing and lobsters and other mobile biota to absorb, bioaccumulate, and transfer them to New York.

144.    Designation of the Eastern Site and its resulting use for disposal of dredged materials risks interfering with the safety, logistics, and flow of important ferry traffic between New York and New England via the Cross Sound Ferry.

---

[22] SEIS, Appendix J, p. 58.

## FIRST CLAIM FOR RELIEF

**EPA's Determination that a Third Open Water Disposal Site Is Needed in
the Long Island Sound Was Arbitrary and Capricious, in Violation of
the Administrative Procedure Act**

145.    New York hereby incorporates by reference the allegations contained in
Paragraphs 1 through 144 as if fully set forth herein.

146.    In determining that a permanent dredged material disposal site was needed in the
eastern Long Island Sound, EPA unreasonably: (a) inflated the baseline of capacity needed for
the Sound by including all 15.5 mcy of sand projected to be dredged as material needing open
water disposal; (b) understated the available capacity at the already designated, historically used
Central Site, which has regularly taken dredged materials from the eastern Sound area, by
approximately 16 mcy; and (c) excluded the possibility of disposing of any material from the
eastern Sound at the Rhode Island Site, even though the Sound extends well into Rhode Island,
and that site has ample remaining capacity and lies only 44 nautical miles from the New London
Harbor dredging center.

147.    EPA's determination that a third Ocean Dumping Act designated permanent
disposal site in the Long Island Sound is needed to accommodate the anticipated volume of
dredged materials from projects in the eastern Sound basin was arbitrary and capricious.

148.    EPA's determination that a third disposal site is needed in the Long Island Sound
is contrary to the frequently stated goal of reducing and eliminating the disposal of dredged
material into the Sound, as articulated in federal regulations issued by EPA, and officially stated
by New York and Connecticut.

149.    The availability of a third dredged material disposal site in the Long Island Sound
likely will lead to its maximum usage as the least costly option for dredging projects in and

46

around the eastern Long Island Sound area and impede achieving the goal of minimizing the disposal of dredged material into the Sound.

150.    Accordingly, EPA's final rule designating the Eastern Site as a permanent disposal area was arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law, in violation of the Administrative Procedure Act.

**SECOND CLAIM FOR RELIEF**

**EPA's Consideration of Interference with Shipping and Navigation and Determination that Designation of the Eastern Site Would Minimize Interference with Navigation Was Arbitrary and Capricious, in Violation of the Ocean Dumping Act and the Administrative Procedure Act**

151.    New York hereby incorporates by reference the allegations contained in Paragraphs 1 through 144 as if fully set forth herein.

152.    EPA's determination that commercial vessel traffic was "less of a concern" in evaluating whether to designate a site in the eastern Sound, and its failure to rule out the Eastern Site because of interference with commercial vessel traffic, was arbitrary and capricious.

153.    In designating the Eastern Site, EPA failed to consider the high volume of daily of Cross Sound Ferry's New London to Orient Point ferry traffic through the designated site and the potential for that high traffic to be affected by the disposal activities at the site.

154.    As a result, EPA failed to give full consideration to minimization of interference with commercial navigation, avoidance of regions of heavy commercial navigation, and the impact of the designation on a legitimate use of the ocean, namely, the interstate ferry traffic between New London and Orient Point.

155.    In addition, EPA failed to reasonably respond to NYSDOS and NYSDEC's comments raising the issue of interference with marine traffic in the area of the Eastern Site,

discussing instead the submarine traffic traversing the former New London Site, while avoiding

mention of ferry traffic through the Eastern Site.

156.   Because EPA failed to reasonably evaluate the regulatory criterion of interference

with navigation, and in so doing inexplicably omitted material data concerning ferry traffic,

EPA's designation of the Eastern Site violated the Ocean Dumping Act, and was arbitrary and

capricious, an abuse of discretion or otherwise not in accordance with law, in violation of the

Administrative Procedure Act.

**THIRD CLAIM FOR RELIEF**

**EPA's Designation of a Previously Unused Disposal Site when Historically
Used Sites Were Feasible Was Arbitrary and Capricious, in Violation of the
Ocean Dumping Act and the Administrative Procedure Act**

157.   New York hereby incorporates by reference the allegations contained in

Paragraphs 1 through 144 as if fully set forth herein.

158.   The Niantic Bay alternative site considered by EPA was historically used before

EPA designated the Eastern Site.

159.   According to EPA, approximately 14 mcy of the Niantic Bay alternative site is

containment area.  This alternative site is located a comparable distance from the New London

Harbor dredging center as the Eastern Site.

160.   The Western, Central, and Rhode Island Sites are historically used, EPA-

designated sites that have available capacity to accommodate dredged materials from the eastern

basin of the Sound.

161.   Designation and use of the historically-used Niantic Bay alternative site analyzed

in the SEIS, or the EPA-designated Western, Central, and Rhode Island Sites, instead of the

undisturbed Eastern Site, was feasible.  EPA's designation of Eastern Site as a permanent

48

dredged material disposal site, when it was feasible to designate the historically used Niantic Bay

Site, or use the designated Western, Central, and Rhode Island Sites, violated the Ocean

Dumping Act, and was arbitrary and capricious, an abuse of discretion, or otherwise not in

accordance with law, in violation of the Administrative Procedure Act.

## FOURTH CLAIM FOR RELIEF

**EPA's Failure to Explain or Evaluate the Possibility that Dredged Materials
from Non-Federal Projects of Under 25,000 cy That Do Not Meet Ocean
Dumping Act Standards Would Be Disposed of at the Eastern Site Violated
the Ocean Dumping Act, and Was Arbitrary and Capricious, in Violation
the Administrative Procedure Act**

162.    New York hereby incorporates by reference the allegations contained in

Paragraphs 1 through 144 as if fully set forth herein.

163.    The criteria applied to determine the suitability of dredged material for open water

disposal are materially different under the Ocean Dumping Act and Clean Water Act.  The

Ocean Dumping Act criteria are broader and more proscriptive.

164.    EPA has based its conclusions in the final rule concerning the impacts on human

health and the environment from disposing of dredged material at the Eastern Site on the

erroneous assumption that only material deemed suitable under the more rigorous Ocean

Dumping Act criteria will be dumped there.

165.    The Army Corps and EPA have estimated that approximately 44% of the dredged

material to be generated in the Long Island Sound area over the next thirty years will come from

private projects.  Some or all of those dredged materials, a significant amount of which are

located in the eastern Sound area, may permissibly be evaluated under the Clean Water Act

suitability criteria, not Ocean Dumping Act criteria, depending on whether the material is

dredged in projects of less or greater than 25,000 cy.

166.   As noted above in paragraphs 89-90, during the public comment period of the rulemaking, commentators specifically raised the issue of the relative stringency of the Ocean Dumping Act and Clean Water Act standards, and the difference in environmental harm that might arise from dumping materials subject only to the Clean Water Act standards as compared to materials also subject to the Ocean Dumping Act.  EPA failed to address the issue.  This failure is material to the reasonableness of EPA's conclusion that designation of the Eastern Site will have no significant long-term adverse environmental impacts because only material deemed "suitable" under the Ocean Dumping Act will be disposed of at the Site.

167.   There is a reasonable likelihood that the difference in standards could allow more heavily contaminated material to be disposed of under the Clean Water Act standards than under the Ocean Dumping Act standards, and therefore cause the creation of greater or different environmental harms than those upon which the analysis in the SEIS was predicated.

168.   EPA failed to respond in a reasoned matter to comments raising issues regarding the relative stringency of the Clean Water Act and Ocean Dumping Act standards, and the extent to which the differences in those standards could lead to greater or different environmental impacts than those upon which the analysis in the SEIS was predicated.

169.   Additionally, EPA failed to reasonably evaluate the likelihood that dredged materials from non-federal federal projects of under 25,000 cy that could not meet Ocean Dumping Act suitability criteria would nevertheless be disposed of at the Eastern Site; EPA similarly failed to reasonably evaluate the impacts of the disposal of such material at the Site.

170.   By failing to evaluate the possible impacts from disposal of dredged materials subject only to evaluation under Clean Water Act standards, EPA failed to reasonably consider

the "types and quantities" of dredged materials that will be dumped at the Eastern Site in the next

thirty years in accordance with 40 C.F.R. § 228.6(a)(4).

171.   Accordingly, EPA's designation of the Eastern Site violated the Ocean Dumping

Act, and was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with

law, in violation of the Administrative Procedure Act.

### FIFTH CLAIM FOR RELIEF

**EPA's Designation of the Eastern Site as a Permanent Dredged Material
Disposal Site Was Not Consistent to the Maximum Extent Practicable with
New York's Coastal Zone Management Program, in Violation of the Coastal
Zone Management Act and the Administrative Procedure Act**

172.   New York hereby incorporates by reference the allegations contained in

Paragraphs 1 through 171 as if fully set forth herein.

173.   The Coastal Zone Management Act requires all Federal agency activities that

affect any land or water use or natural resource in a coastal zone to be "carried out in a manner

which is consistent to the maximum extent practicable with the enforceable policies" of any state

coastal management program which encompasses that coastal zone and which has been approved

by the U.S. Secretary of Commerce. 16 U.S.C. § 1456(c)(1)(A).

174.   New York's Long Island Sound Management Program and the Southold

Waterfront Program are both incorporated into the NYS Coastal Management Program approved

by the Secretary of Commerce.

175.   In 2006, the Secretary of Commerce approved an expanded coastal boundary in

Long Island Sound that includes Connecticut's state waters to the -20' bathymetric mark depth

for purposes of consistency review under the NYS Coastal Management Program.

176.   Because the Eastern Site is within the -20' bathymetric mark depth in

Connecticut's state waters, it is subject to the NYS Coastal Management Program.

177.  EPA's designation of the Eastern Site was not consistent to the maximum extent practicable with the NYS Coastal Management Program because, among other reasons:

(1)  EPA's arbitrary and capricious determination that a permanent dredged material disposal site was needed in the eastern Sound areas was not consistent to the maximum extent practicable with: (a) Sub-policy 5.3 of the Long Island Sound Management Program, to protect and enhance the quality of coastal waters; (b) Policy 8 of the Southold and Long Island Sound Programs, to minimize environmental degradation from solid waste and hazardous substances and wastes; (c) Sub-policy 8.1 of the Long Island Sound Program, to manage solid waste to protect public health and control pollution; (d) Sub-policy 8.3 of the Southold and Long Island Sound Programs, to protect the environment from degradation due to toxic pollutants and hazardous substances; (e) Policy 10 of the Southold and Long Island Sound Programs, to protect water-dependent uses; or (f) Sub-policy 10.5 of the Southold Program and Sub-policy 10.6 of the Long Island Sound Program, to provide sufficient infrastructure for water-dependent uses, because it diverts dredged material from opportunities for beneficial reuse.

(2)  EPA's failure to consider heavy ferry traffic through the Eastern Site was not consistent to the maximum extent practicable with Policy 10 of the Southold and Long Island Sound Programs, to protect water-dependent uses; or (b) Sub-policy 10.5 of the Southold Program and Sub-policy 10.6 of the Long Island Sound Program, to provide sufficient infrastructure for water-dependent uses, because it interferes with an existing ferry lane.

(3)  EPA's designation of a previously unused disposal site, when historically used sites were feasible, was not consistent to the maximum extent practicable with: (a) Sub-policy 5.3 of the Long Island Sound Program, to protect and enhance the quality of coastal waters; (b) Policy 6 of the Southold and Long Island Sound Programs, to protect and restore the quality of function

52

of the ecosystem; (c) Sub-policy 6.1 of both Programs, to protect and restore ecological quality; (d) Policy 8 of both Programs, to minimize environmental degradation from solid waste and hazardous substances and wastes; (e) Sub-policy 8.1 of the Long Island Sound Program, to manage solid waste to protect public health and control pollution; (f) Sub-policy 8.3 of both Programs, to protect the environment from degradation due to toxic pollutants and hazardous substances; or (g) Policy 10 of both Programs, to protect water-dependent uses.

(4)   EPA's failure to evaluate the material differences between the Ocean Dumping Act and the Clean Water Act criteria for the suitability of dredged material for open water disposal was not consistent to the maximum extent practicable with: (a) Policy 5 of the Southold and Long Island Sound Programs, to protect and improve water quality and supply; (b) Sub-policy 5.3 of the Long Island Sound Program, to protect and enhance the quality of coastal waters; (c) Policy 8 of both Programs, to minimize environmental degradation from solid waste and hazardous substances and wastes; (d) Sub-policy 8.1 of the Long Island Sound Program, to manage solid waste to protect public health and control pollution; (e) Sub-policy 8.3 of both Programs, to protect the environment from degradation due to toxic pollutants and hazardous substances; (f) Policy 11 of both Programs, to promote the sustainable use of living marine resources; (g) Sub-policy 11.1 of both Programs, to ensure the long-term maintenance and health of living marine resources; or (h) Sub-policy 11.2 of the Southold Program, to provide for commercial and recreational use of Southold's living marine resources.

177.    Accordingly, EPA's designation of the Eastern Site was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, New York requests judgment in its favor and against defendants upon

each claim, and requests that this Honorable Court enter judgment against defendants vacating

the final rule designating the Eastern Site as a permanent dredged material disposal site, and

ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated:  New York, New York
         October 11, 2017

                            ERIC T. SCHNEIDERMAN
                            Attorney General of the State of New York
                            Attorney for Plaintiffs


                             By:   /s/ Andrew J. Gershon
                                   Andrew J. Gershon
                                   Lemuel Srolovic
                                   Andrew Frank
                            Assistant Attorneys General
                            Environmental Protection Bureau
                            120 Broadway, 26th Floor
                            New York, New York 10271
                            Andrew.Gershon@ag.ny.gov
                            212-416-8474

# EXHIBIT A

## REFERENCE MAP OF SITES AND LOCATIONS DESCRIBED IN THE COMPLAINT

