UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROSSANA ROSADO, in her official capacity as
NEW YORK STATE SECRETARY OF STATE, et
al.,

                          Plaintiffs,                       **MEMORANDUM & ORDER**

TOWN OF SOUTHOLD, NEW YORK, et al.,                1:17-cv-04843-ERK-RLM

                   Plaintiffs-Intervenors

          – against –

ANDREW WHEELER, in his official capacity as
Acting Administrator of the United States
Environmental Protection Agency, et al.,

                          Defendants,

CONNECTICUT DEPARTMENT OF ENERGY
& ENVIRONMENTAL PROTECTION,

                   Defendant-Intervenor.

KORMAN, *J.*:

          Beginning where the parties agree, Long Island Sound is a national treasure. It is home to

abundant wildlife, host to litany activities, and serves as an engine of economic activity that

expands throughout our nation. *See Town of Huntington v. Marsh*, 859 F.2d 1134 (2d Cir. 1988).

For these same reasons, public and private stakeholders—neighbors and partners in a variety of

realms—sometimes disagree on how to best safeguard its waters. This is particularly true when it

comes to the topic of dredge disposal. *See Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79

(2d Cir. 1975); *Forbes v. U.S. Army Corps of Eng'rs*, Order and Judgment, No. 95-CV-4374

(E.D.N.Y. June 28, 2000) (Platt, J.). In this latest dispute, the question is whether the

Environmental Protection Agency followed the decision-making processes set out by two laws—

1

the Marine Protection, Research, and Safety Act ("MPRSA"), and the Coastal Zone Management Act ("CZMA")—when the agency designated the Eastern Long Island Sound Site as an open-water dredge disposal site in November 2016.

## I.     Background

A.     Statutory and Regulatory Background

1.     *The Marine Protection, Research, and Sanctuaries Act*

Congress enacted the MPRSA in 1972 to mitigate the environmental impact of unregulated dumping in ocean waters, and to prohibit the unauthorized transportation or dumping of waste from the United States into ocean waters. 33 U.S.C. § 1411. The MPRSA generally applies to ocean waters beyond U.S. territory, and in this regard, complements the Clean Water Act, which prohibits the discharge of pollutants into the navigable waters of the United States. 33 U.S.C. §§ 1311, 1362(12). Since Long Island Sound lies in U.S. waters, it was not initially subject to the MPRSA. However, recognizing the Sound's unique contribution to our nation's environment, economy, and national security, Congress amended the MPRSA to cover the Sound's waters in 1980. Thus, under the Ambro Amendment, "the dumping of dredged material in Long Island Sound from any Federal project (or pursuant to Federal authorization) or from a dredging project by a non-Federal applicant exceeding 25,000 cubic yards" must comply with the MPRSA. 33 U.S.C. § 1416. To this day, the Sound is the only landward body of water subject to the MPRSA.

The MPRSA governs site designations as well as permitting for disposal at such sites. Under the law, EPA and the Army work together throughout these processes. Specifically, Section 1413 of the MPRSA provides that the Secretary of the Army may issue permits for the disposal of dredged material, on the conditions that the Secretary has determined that such dumping "will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment,

ecological systems, or economic potentialities." 33 U.S.C. §1413(a). To determine whether proposed dumping meets this standard, the Army Corps of Engineers is directed to consider the regulatory criteria established by EPA pursuant to Section 1412(a), which states that the EPA "Administrator shall establish and apply criteria for reviewing and evaluating such permit applications, and, in establishing or revising such criteria, shall consider, but not be limited in his consideration to, the following:

> (A) The need for the proposed dumping.
>
> (B) The effect of such dumping on human health and welfare, including economic, esthetic, and recreational values.
>
> (C) The effect of such dumping on fisheries resources, plankton, fish, shellfish, wildlife, shore lines and beaches.
>
> (D) The effect of such dumping on marine ecosystems, particularly with respect to—
>
>> (i) the transfer, concentration, and dispersion of such material and its byproducts through biological, physical, and chemical processes,
>> (ii) potential changes in marine ecosystem diversity, productivity, and stability, and
>> (iii) species and community population dynamics.
>
> (E) The persistence and permanence of the effects of the dumping.
>
> (F) The effect of dumping particular volumes and concentrations of such materials.
>
> (G) Appropriate locations and methods of disposal or recycling, including land-based alternatives and the probable impact of requiring use of such alternate locations or methods upon considerations affecting the public interest.
>
> (H) The effect on alternate uses of oceans, such as scientific study, fishing, and other living resource exploitation, and non-living resource exploitation.
>
> (I) In designating recommended sites, the Administrator shall utilize wherever feasible locations beyond the edge of the Continental Shelf.

Section 1412(c) directs EPA to consider these same factors in establishing and applying criteria for site designations.

3

Pursuant to these provisions, EPA has promulgated a set of general and specific criteria to guide its dredge disposal site designations. Section 228.5 establishes four general criteria for the selection open-water sites:

(a) The dumping of materials into the ocean will be permitted only at sites or in areas selected to minimize the interference of disposal activities with other activities in the marine environment, particularly avoiding areas of existing fisheries or shellfisheries, and regions of heavy commercial or recreational navigation.

(b) Locations and boundaries of disposal sites will be so chosen that temporary perturbations in water quality or other environmental conditions during initial mixing caused by disposal operations anywhere within the site can be expected to be reduced to normal ambient seawater levels or to undetectable contaminant concentrations or effects before reaching any beach, shoreline, marine sanctuary, or known geographically limited fishery or shellfishery.

(c) [Reserved by 73 FR 74987]

(d) The sizes of ocean disposal sites will be limited in order to localize for identification and control any immediate adverse impacts and permit the implementation of effective monitoring and surveillance programs to prevent adverse long-range impacts. The size, configuration, and location of any disposal site will be determined as a part of the disposal site evaluation or designation study.

(e) EPA will, wherever feasible, designate ocean dumping sites beyond the edge of the continental shelf and other such sites that have been historically used.

40 C.F.R. § 228.5. Section 228.6—the specific criteria—further provides that "[i]n the selection of disposal sites, in addition to other necessary or appropriate factors determined by the Administrator, the following factors will be considered:

(1) Geographical position, depth of water, bottom topography and distance from coast;

(2) Location in relation to breeding, spawning, nursery, feeding, or passage areas of living resources in adult or juvenile phases;

(3) Location in relation to beaches and other amenity areas;

(4) Types and quantities of wastes proposed to be disposed of, and proposed methods of release, including methods of packing the waste, if any;

(5) Feasibility of surveillance and monitoring;

(6) Dispersal, horizontal transport and vertical mixing characteristics of the area, including prevailing current direction and velocity, if any;

(7) Existence and effects of current and previous discharges and dumping in the area (including cumulative effects);

(8) Interference with shipping, fishing, recreation, mineral extraction, desalination, fish and shellfish culture, areas of special scientific importance and other legitimate uses of the ocean;

(9) The existing water quality and ecology of the site as determined by available data or by trend assessment or baseline surveys;

(10) Potentiality for the development or recruitment of nuisance species in the disposal site;

(11) Existence at or in close proximity to the site of any significant natural or cultural features of historical importance.

40 C.F.R. § 228.6(a). EPA is further required to base site designations on environmental studies of each site, regions adjacent to the site, and on historical knowledge of the impact of dredged material disposal on areas similar to such sites in physical, chemical, and biological characteristics, and discuss these criteria in any environmental impact statement prepared in connection with a proposed site designation. 40 C.F.R. §§ 228.4, 228.6(b).

Before a site may be used, EPA and the Corps must develop a Site Management and Monitoring Plan ("SMMP"), including an assessment of site conditions, a program for monitoring the site, special management conditions or practices to be implemented at the site to protect the environment, consideration of the quantity of material to be disposed of at the site and the presence of contaminants in the material, consideration of the anticipated use of the site over the long term, and a schedule for review and revision of the plan. 33 U.S.C. §§ 1412(c)(3), (c)(4). Finally, as outlined in greater detailed below, both the Corps and EPA play significant roles in ensuring that any proposed disposal at open-water sites complies with testing and environmental standards as required under the MPRSA (and separately, the Clean Water Act).

2.    *The Coastal Zone Management Act*

5

The same week President Nixon signed the MPRSA into law, he also signed the CZMA. In view of the reality that environmental protection requires significant deliberation between the federal government and state and local authorities, Congress had enacted the CZMA to further the "national interest in the effective management, beneficial use, protection, and development of the coastal zone." 16 U.S.C. § 1451(a). Under the CZMA, coastal jurisdictions may develop their own coastal zone management programs, which are subject to federal approval by the National Oceanic and Atmospheric Administration (NOAA) in the Department of Commerce. *Id*. § 1455(d).

Once a given coastal zone management program is approved, "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." *Id*. § 1456(c)(1)(A). Moreover, any such agency shall issue a consistency determination to the relevant State agency no later than 90 days before final approval of the federal activity. *Id*. § 1456(c)(1)(C). Jurisdictions may then concur or object to the federal agency's consistency determination. *Id.* § 1456(c)(3)(A).

B.     Factual Background

1.     *The Sound and the Need to Dredge Generally*

Long Island Sound is a 110-mile long semi-enclosed tidal estuary spanning the coastlines of New York, Connecticut, and Rhode Island. The Sound connects to the Atlantic Ocean at its eastern end and New York Harbor at its western end, with the Connecticut-New York state line cutting east-west through the middle. It contains three general areas: the Western Basin, which runs from the Narrows (between Throgs Neck and Willets Point, New York) to the Stratford Shoal (between Stratford Point, near Bridgeport, Connecticut, and Port Jefferson, New York); the Central Basin, which stretches from the Stratford Shoal to the Mattituck Sill (between Mulberry Point,

6

Connecticut, and Mattituck Point, New York); and the Eastern Basin, which extends from the Mattituck Sill to the Race at the eastern end of the Sound and includes Peconic Bay, Gardiners Bay, and Fishers Sound.

There are more than 200 harbors, coves, bays, and navigable rivers that require occasional dredging in the Sound. Essentially, dredging entails the excavation of materials and sediments that accumulate over time on the seafloor due to natural and industrial causes. While some of this sediment may be suitable for beneficial uses such as renourishing beaches, constructing wetlands, and capping landfills, a significant portion still requires open-water disposal. And while dredged materials are not necessarily toxic, they may be contaminated by municipal, industrial wastes, or agricultural runoff. 40 C.F.R. § 227.13(a). The Army Corps of Engineers alone is responsible for 52 ongoing maintenance and improvement projects—aptly titled "Federal Navigation Projects"— in the Sound and adjacent waters, most of which are in Connecticut's waters. AR-82, DMMP at 3. While Corps projects generate a substantial portion of the material dredged in the Sound, other federal and non-federal projects are needed to accommodate marinas, boat yards, and coastal businesses. FSEIS at 74. Indeed, dredging has occurred in the Sound since at least the 1870s, and the continued need for dredging is not disputed. Even while objecting to the designation of the Eastern Site at issue here, New York asserted that "[a]s a state with considerable water dependent uses and navigation infrastructure, New York recognizes the need for, and is fully supportive of, dredging for maintaining these types of activities." AR-23, EPA Response to New York Objection, at 18–19. Southold's comments acknowledged the same. FSEIS at 3695–96. The trouble arises when all that material has to go somewhere.

2.   *Recent Site Designations in the Sound*

The current dispute can be traced to 1999, when EPA published a notice of intention to consider whether it was appropriate to designate disposal sites in the Sound. 64 Fed. Reg. 29865–

01 (June 3, 1999). In March 2002, EPA issued a notice stating the agency's intention to first consider whether disposal sites should be designated in the Western and Central basins, and thereafter consider whether a site would be needed in the eastern Sound. 70 Fed. Reg. 32498–01, 32509 (June 3, 2005). Following that plan, EPA designated the Rhode Island Sound Disposal Site as a permanent site in 2004. DMMP at 164. The following year, EPA designated the Central and Western Long Island Disposal Sites. The EPA's Final Environmental Impact Statement in support of designating those sites did not address the dredging needs of the eastern Sound, but stated the agency would soon conduct supplemental analysis of the entire Sound. 70 Fed. Reg. at 32509.

While Connecticut concurred with EPA's determination that designation of the Central and Western sites was consistent with the state's coastal management program, New York initially objected. Negotiation ensued, and the parties agreed to certain site use restrictions, under which New York concurred that sites were consistent with their enforceable coastal zone management programs. *See* AR-62 (70 Fed. Reg. at 32498, 32511–514, 32518–520) (40 C.F.R. §§ 228.15(b)(4)(vi), (b)(5)(vi)); AR-A 060, pp. 1–2;. These restrictions included, among other conditions, agreements that: dredged material would only be placed at the sites after a demonstration that there were not practicable alternatives to open-water disposal, disposal would be barred during weather that would create a heightened risk of spillage during transit, and any party could petition the EPA to amend the site use restrictions in the event that the volume of open-water disposal has not declined by 2026. 81 Fed. Reg. 44220-01, 44229–30 (July 7, 2016).

Most significantly, EPA agreed to publish a Sound-wide Dredged Material Management Plan ("DMMP"), researched and drafted by the Army Corps. The basic idea is that the DMMP would analyze dredging needs through 2045, contemplate beneficial uses of dredged material, and outline oceanographic and biological conditions across the Sound. AR-7, DSEIS, at 48–49, 80; AR-8, Report of the Public Scoping Meetings, at 47. In short, the DMMP aimed "to provide a 30

year management strategy to add certainty to dredging and placement activities from navigation channels and Port facilities within the region in an environmentally acceptable and economically practicable manner, and to develop alternatives to reduce or eliminate open water placement where practicable." DMMP at 60.

By 2011, the two dredged material disposal sites operating in the eastern Sound—the New London Disposal Site (NLDS) and the Cornfield Shoals Disposal Site (CSDS)—were scheduled to close. To buy time to evaluate a potential new site to service the eastern Sound, Congress extended the life of those sites for five additional years, until December 2016. AR-A 202; FSEIS at 58–59.  In July 2012, EPA began investigating whether a new disposal site, or multiple sites, should be designated to service the eastern Sound, and reached out to cooperating agencies including the New York Department of State ("NY DOS") and the Connecticut Department of Energy and Environmental Protection ("DEEP"). Report of the Public Scoping Meetings at 60. Three months later, consistent with EPA's decision to follow the agency's Statement of Policy for Voluntary Preparation of National Environmental Policy Act ("NEPA") Documents, EPA issued a notice of intent to prepare a supplemental environmental impact statement in connection with the evaluation of potential sites in the eastern Sound. 77 Fed. Reg. 63312 (Oct. 16, 2012). The notice stated EPA's intent "to evaluate the two current sites used in eastern Long Island Sound, the CSDS and NLDS, as well as other sites for, and means of, disposal and management." *Id*. The notice also expressly stated that, pursuant to the law, EPA would consider a "no action alternative," meaning the alternative of not designating any new sites. *Id*.

In furtherance of this process, EPA held two public "scoping" meetings in late 2012 and early 2013, in Groton, Connecticut and Riverhead, New York. These meetings allowed public input on the potential designation of one or more dredged material disposal sites. Both featured speakers from the NY DOS, CT DEEP, and the Army Corps of Engineers. Report of the Public Scoping

Meetings at 19. At one of those meetings, which was attended by NY DOS and New York Department of Environmental Conservation ("NY DEC"), EPA stated that it was screening for potential sites using a Zone of Siting Feasibility ("ZSF") extending 25 nautical miles from the known dredging centers in the eastern Sound—*i.e.*, 25 nautical miles was the maximum haul distance between the projected dredging locations and potential disposal site. FSEIS at 888–891. The ZSF spanned from Guilford, Connecticut on the western end to Montauk Point, New York, on the eastern end. FSEIS at 30 (Figure ES-2).

EPA screened 11 potential sites and the "no action alternative" through a two-tier process. The first tier was designed to ascertain which sites within the ZSF were more or less appropriate than others, while the second tier was designed to yield specific follow-up recommendations. To explain this process to stakeholders and solicit feedback, EPA held two public meetings in June 2014: one in Riverheard, New York, and one in New London, Connecticut. EPA then held two additional meetings in December 2014 to convey the agency's findings as memorialized in its Supplemental Environmental Impact Statement, including the agency's oceanography survey results covering the entire eastern Sound area. EPA explained that the agency had narrowed the field of 11 potential sites down to six: Cornfield Shoals, New London, Niantic Bay, Orient Point, Clinton, and Six Mile Reef. *See* Report of the Public Scoping Meetings at 329. In April 2015, EPA published an analysis of these six sites. AR-9. At that time, EPA explained it was in fact considering a modified version of the New London Site, including two new areas reaching roughly 1.5 nautical miles to the west of the site's existing boundaries, called "NL-Wa" and "NL-Wb." *Id*. at 70.

In December 2015, the Corps completed its Dredged Material Management Plan. The DMMP projected that between 2015–2045, dredging projects across the Sound would generate 52.89 million cubic yards of material, 34 million of which would be fine-grained sediment suitable for disposal at an open-water site. The Corps projected that the majority of the remaining

material—roughly 15.5 million cubic yards—would be sand that could be used for beneficial beach use.[1] DMMP at 150.

In April 2016, EPA issued its Proposed Rule for public comment, and concurrently published its Draft Supplemental Environmental Impact Statement ("DSEIS"). AR-5, Proposed Rule (81 Fed. Reg. 24748); DSEIS. In line with EPA's April 2015 site analysis, the Proposed Rule suggested designating an Eastern Sound Disposal Site ("ELDS" or "Eastern Site") comprised of the western half of the existing New London Site, coupled with two new adjacent areas extending roughly a mile and a half to the west. EPA explained that this site would be appropriate because unlike the existing Niantic Bay and Cornfield Shoals sites, it is a containment site, meaning that disposed sediment would not drift from the site and contaminate nearby areas. EPA also asserted the Eastern Site would have minimal environmental impacts on water quality and benthic habitat in the eastern Sound compared against the other candidates. DSEIS at 377–86. Moreover, EPA pointed out that the existing New London Site had limited capacity after years of use, the eastern portion of the site interfered with the New London Submarine Base, and a more compact site would be more manageable. *Id*. at 377. EPA supported the Proposed Rule with a variety of findings, including: analysis of alternative sites; the physical oceanography of the eastern Sound; sonar data; biological data; disposal monitoring data from the existing New London Disposal Site; a survey of physical and chemical characteristics of sediment found across the eastern Sound; fish habitat data; the extensive public involvement throughout the designation process; and a draft site management and monitoring plan ("SMMP") for the prospective Eastern Site. EPA proposed attaching the same site use restrictions to the Eastern Site

---

[1] The Corps estimated that the remaining 3.3 million cubic yards of sediment would be unsuitable for open-water disposal. DMMP at 150.

that the agency had agreed to apply to the Central and Western Sites. 81 Fed. Reg. 24748–01, 24763 (Apr. 27, 2016).

The public comment period in connection with the proposed designation of the Eastern Site ran from April 27, 2016 through July 18, 2016. 81 Fed. Reg. 87820, 87832 (Dec. 6, 2016). During this period, the EPA held four public hearings, all in May 2016. The agency received over 6,700 letters, emails, petition signatures, and verbal comments. FSEIS at 68. On the last day of the public comment period, NY DOS and NY DEC submitted comments arguing that a new permanent site designation was unnecessary given the available capacity at the Central Site, which they alleged was far more than the 20 million cubic yards ultimately claimed by the EPA.

In July 2016, based on the Corps' findings in the DMMP, EPA amended the site use restrictions for the Western and Central Sites. On July 18, New York concurred with EPA's determination that the amended designations were consistent to the maximum extent practicable with the enforceable policies of New York's CMP. That same day, New York submitted a letter to EPA with comments regarding the proposed Eastern Site, stating that although it agreed that the same site-use restrictions that were recently added to the Western and Central Sites should be applied to the Eastern Site as well, EPA should designate the Niantic Bay and New London Sites as remediation sites—only for use in certain exigent circumstances—instead of designating a new long-term site to service the eastern Sound. AR-A-43, July 18, 2016 Letter at 1–2. New York also objected to the Eastern Site's designation on the basis that the site would be "on top of vessel traffic lanes." *Id*. at 3. In response to New York's objections, EPA requested that the Corps take a harder look at projected dredging needs in the eastern Sound. AR-80. In September 2016, the Corps provided updated projections, concluding that a disposal capacity of 20 million cubic yards, based on water volume below a depth of 59 feet, would likely be sufficient. *See* FSEIS at 78.

Two weeks later, pursuant to the CZMA, EPA sent its consistency determination for the Eastern Site to New York, arguing that the designation—like that of the Central and Western Sites—was consistent to the maximum extent possible with all enforceable policies within the NY CMP and LWRP. In early October, New York responded with its objections that the EPA's analysis contradicted certain specific policies contained in the state's coastal zone management programs. AR-20, New York's Objection.

On August 4, 2016, after the public comment period closed, New York Governor Cuomo sent a letter to President Obama and EPA indicating that New York was opposed to *any* dredged material site being designated in the eastern region of Long Island Sound. August 4, 2016, Governor Cuomo Letter. This was the first time the Governor—or any representative from New York's cooperating agencies—voiced wholesale opposition to a site in the eastern Sound. The letter indicated New York's intent to initiate legal action to block the designation of the Eastern Site, and reiterated the State's position that the remaining capacity at existing sites obviated the need for the Eastern Site.

On November 4, 2016, EPA responded to New York's Objection, again arguing the Eastern Site was in fact consistent to the maximum extent practicable with the enforceable coastal policies of the NYS Coastal Management Program. AR-22. That same day, EPA issued its final rule designating the Eastern Site as a permanent disposal site under the MPRSA. Notwithstanding EPA's disagreement with New York's objections, the agency agreed to make further changes to the Eastern Site. In particular, EPA excluded the portion of the proposed site that overlapped with the prior New London Site, such that the designated site included only the adjacent NL-Wa and NL-Wb areas. 81 Fed. Reg. 87824. The rule was published on December 6, 2016, and went into effect on January 5, 2017. 81 Fed. Reg. 87820.

## II. PROCEDURAL HISTORY

New York filed its amended complaint on October 11, 2017. ECF No. 9. Connecticut moved to intervene as a defendant on November 30, 2017. ECF No. 12. The Town of Southold, New York, moved to intervene as a plaintiff on December 21, 2017, and filed its complaint in intervention on February 2, 2018. ECF Nos. 14, 18, 21. The County of Suffolk, New York, moved to intervene as a plaintiff on March 27, 2018. ECF No. 29. EPA filed its answer to the Southold complaint on March 26, 2018, and its answer to Suffolk on June 6, 2018. ECF Nos. 27, 43. Connecticut filed its answer to the Southold complaint on March 29, 2018. ECF No. 31.

Plaintiffs move for summary judgment on five claims for relief under the MPRSA, CZMA, and APA. First, Plaintiffs argue EPA's determination that a new site was needed to service the eastern Sound was arbitrary and capricious. Second, Plaintiffs argue EPA failed to adequately consider potential interference with shipping and navigation. Third, Plaintiffs argue EPA arbitrarily decided to designate a new site rather than relying on historically used sites. Fourth, Plaintiffs argue EPA failed to consider the pollutive effects of disposing dredged materials from non-federal projects of less than 25,000 cubic yards. Fifth, Plaintiffs argue EPA's designation of the Eastern Site as a permanent dredged material disposal site was not consistent to the maximum extent practicable with their coastal zone management programs. In addition to these claims, Southold raises three additional claims alleging that EPA failed to respond to certain public comments.

Defendants and Defendant-Intervenor cross-move for summary judgment and in opposition to Plaintiffs' and Plaintiffs-Intervenors' motions for summary judgment. Those cross motions are before the court.[2]

---

[2] Suffolk filed a separate brief echoing the arguments made by New York. Suffolk also highlighted that a 2014 study showed how the LIS adds between $17 billion and $36 billion in economic activity. Suffolk Br. at 4. Suffolk also maintains, without explanation, that "Dumping dredged materials at the Eastern Site *could* have a significant harmful effect on this multi-million-dollar

### III.   STANDARD OF REVIEW

The Administrative Procedure Act ("APA") provides that a court may set aside an agency's findings, conclusions of law or action if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013). An agency decision may be deemed arbitrary and capricious: "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 79 (2d Cir. 2006). Thus, in evaluating agency actions under the "arbitrary and capricious" standard, courts do not ask "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782, (2016). Instead, the question is whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Ore. Nat. Res. Council,* 490 U.S. 360, 378 (1989) (quotation omitted).

Judicial review of agency rulemaking is limited to the administrative record, and "a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015). Where, as here, review of an agency's action is "bound up with a record-based factual conclusion," the reviewing court must determine whether that conclusion "is supported by substantial evidence." *Dickinson v. Zurko*, 527 U.S. 150, 164

---

industry." *Id*. But for the reasons outlined in Section 4.B.1, EPA considered countervailing evidence showing that the failure to designate the Eastern Site would in fact result in economic harms unacceptable to the coastal fishing and maritime communities.

(1999) (quotations omitted). In this context, substantial evidence means "enough evidence to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury." *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939)). Moreover, when an agency has made predictions at the frontiers of science, a reviewing court must generally be at its most deferential. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). Accordingly, the court's scrutiny of an agency's reasoning is especially narrow "in a technical area" within an agency's special expertise. *Elec. Power Supply Ass'n*, 136 S. Ct. at 782.

The court is also limited to reviewing claims that have been properly exhausted in the administrative process. In this case, that pertains to the public comment period EPA held during the rulemaking process. Nonetheless, exhaustion will not bar a claim when "the agency had the opportunity to consider the very argument pressed by the petitioner on judicial review." *Nat. Res. Def. Council, Inc. v. E.P.A.*, 824 F.2d 1146, 1151 (D.C. Cir. 1987) (en banc) (internal quotations omitted). This is consistent with the purpose of administrative exhaustion requirements, which "is to ensure that the agency is given the first opportunity to bring its expertise to bear on the resolution of a challenge to a rule." *Appalachian Power Co. v. E.P.A.*, 135 F.3d 791, 818 (D.C. Cir. 1998). *See also Smith v. Berryhill*, 139 S. Ct. 1765, 1779 (2019) ("a federal court generally goes astray if it decides a question that has been delegated to an agency if that agency has not first had a chance to address the question"); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004) ("To preserve a legal or factual argument, we require its proponent to have given the agency a 'fair opportunity' to entertain it in the administrative forum before raising it in the judicial one.").

## IV.    DISCUSSION

### A.    Subject Matter Jurisdiction

Before turning to Plaintiffs' substantive challenges, EPA moves to dismiss Plaintiffs' claims under the MPRSA for lack of subject matter jurisdiction. EPA contends that because the MPRSA does not waive sovereign immunity, Plaintiffs are barred from bringing standalone claims under that statute. EPA is incorrect. "Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" *United States v. Bormes*, 568 U.S. 6, 9–10 (2012) (quoting *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34 (1992)). The MPRSA provides that "any person may commence a civil suit on his own behalf to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any prohibition, limitation, criterion, or permit[.]" 33 U.S.C. § 1415(g)(1). This constitutes an unambiguous waiver of sovereign immunity for purposes of Plaintiffs' second, third, and fourth claims, each of which claim that EPA violated certain criteria promulgated under Sections 1412 and 1413. *See Town of Huntington v. Marsh*, 859 F.2d at 1143. Thus, this court has jurisdiction to review Plaintiffs' standalone MPRSA claims.

In any event, as all parties agree, this court has subject matter jurisdiction over each of Plaintiffs' claims under the APA. Indeed, it is axiomatic that the APA embodies a "basic presumption of judicial review," *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). *See also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (In determining whether a suit can be brought under the APA, "[w]e begin with the strong presumption that Congress intends judicial review of administrative action."). This "presumption may be rebutted only if the relevant statute precludes review, 5 U.S.C. § 701(a)(1), or if the action is "committed to agency discretion by law, § 701(a)(2)." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). Neither the MPRSA nor the CZMA triggers these exceptions. *See Lincoln v. Vigil*, 508 U.S. 182,

191–92 (1993) (judicial review is precluded where a standard of review would be impossible to devise).

Although the APA does not itself confer subject matter jurisdiction, *see Califano v. Sanders,* 430 U.S. 99, 106–07 (1977), the Federal Question Statute, 28 U.S.C. § 1331, confers jurisdiction over a suit that "arises under" a "right of action" created by the APA. *See Bowen v. Massachusetts,* 487 U.S. 879, 891 n.16 (1988) ("[I]t is common ground that if review is proper under the APA, the District Court ha[s] jurisdiction under 28 USC § 1331."); *see also Sharkey v. Quarantillo*, 541 F.3d 75, 83–84 (2d Cir. 2008) (same). Thus, "[t]he 'right of action' in such cases is expressly created by the [APA], which states that 'final agency action for which there is no other adequate remedy in a court [is] subject to judicial review,' at the behest of '[a] person ... adversely affected or aggrieved by agency action.'" *Japan Whaling Ass'n v. Am. Cetacean So'y.,* 478 U.S. 221, 230 n. 4, (1986) (quoting 5 U.S.C. §§ 702, 704). Here, Plaintiffs' second, third, and fourth claims allege EPA disregarded its legal obligations under the MPRSA, and the agency's decision-making process was otherwise arbitrary, capricious, or not in accordance with the law. Such claims are plainly within the ambit of the APA.

    B.    <u>Plaintiffs' Challenges to the Eastern Long Island Disposal Site</u>

        1.    *Need for a New Site in the Eastern Sound*

Plaintiffs' first allegation is that EPA failed to justify its determination that a new site was needed in the eastern Sound. Specifically, Plaintiffs allege EPA inflated the capacity needed in the Sound by: (1) unreasonably including sand that will be used for beach nourishment; (2) understating the remaining capacity at the Central Site by approximately 16 million cubic yards; and (3) unreasonably assuming that material dredged from the eastern Sound area could not be disposed of at a more distant, existing site, such as the Rhode Island site. ECF. No. 9, Amended Complaint ¶ 146. Plaintiffs now concede that the EPA did not underestimate disposal capacity at

the Central Site, but maintain their arguments regarding sand use and the Rhode Island Site. NY Reply Br. at 19. In response, EPA argues that as a threshold matter, neither the MPRSA nor the agency's implementing regulations require EPA to justify the need for a new site with reference to capacity at existing sites. EPA Br. at 31. EPA further responds that it reasonably concluded that the eastern Sound's disposal needs could only be serviced by a new site in the eastern Sound, rather than pre-existing sites farther afield.

a)    Obligations Under the MPRSA and EPA Regulations

EPA is correct that the factors listed in MPRSA Section 1412(a) are not directly enforceable for purposes of showing a procedural defect in the agency's designation process. As the D.C. Circuit has explained, EPA "is not required by any provision in the [MPRSA] to include in the criteria, in any literal sense, the evaluation factors listed in the [MPRSA] . . . Rather, [the agency] will have satisfied the requirements of [1412](a) by considering those factors, by taking them into account, when [] establish[ing] the criteria" under Sections 228.5 and 228.6. *Nat'l Wildlife Fed'n v. Costle*, 629 F.2d 118, 135 (D.C. Cir. 1980). In this regard, the MPRSA "gives unqualifiedly broad authority to the Administrator to weigh and consider the evaluation factors and, to the extent that he does so, the criteria he promulgates will 'reflect' the factors listed in the Act and the Convention. *Id*. at 132. Moreover, while the MPRSA directs EPA to consider "the need for proposed dumping" in establishing its criteria to designate disposal sites, 33 U.S.C. 1412(a)(A), it does not follow that EPA may only designate a new site upon a showing that existing sites lack capacity.

Turning to EPA's site designation criteria, EPA must consider of the "[t]ypes and quantities of wastes proposed to be disposed of[.]" 40 C.F.R. § 228.6. This criterion ensures that an assessment of dredging and disposal needs is baked into the designation process, and that the agency justifies each new site with reference to such needs. Furthermore, EPA has a separate

19

regulation, aptly titled "Need for Ocean Dumping," that requires the need for disposal to be established before a dumping permit is awarded. 40 C.F.R. Part 227, Subpart C. At any rate, EPA did in fact consider dredging needs. Accordingly, the question is whether EPA's determinations regarding the eastern Sound's dredging needs were consistent with the "reasoned decisionmaking" mandated by the APA. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52. To adjudicate that question, it is first helpful to consider why and how EPA used the ZSF in the designation process.

> b)      The Zone of Siting Feasibility in the Eastern Sound

EPA announced its ZSF for the eastern Sound at a January 2013 meeting, at which New York DOS and DEC representatives were present. Establishing the ZSF was a standard step in the designation process, outlined in EPA's 1986 "Ocean Dumping Site Designation Delegation Handbook." AR-A 061, Designation Handbook at 77. Following the Handbook and prior practice, EPA explained it would use the same ZSF that all parties had agreed was reasonable with respect to the Western and Central designation processes—25 nautical miles, measured from known dredging centers. FSEIS at 891. EPA noted that metric was chosen to incorporate what the agency had learned through the Corps' analysis of dredging needs. *Id*.; Report of the Public Scoping Meetings at 222. EPA further justified the ZSF on the grounds that more distant sites would require longer, more expensive trips, increasing air pollution and elevating the risk of collisions and spills. EPA solicited objections to the ZSF, but no one, including Plaintiffs' representatives, raised any.[3] FSEIS at 891. It bears emphasizing that at this point, EPA was not determined to designate a site

---

[3] New York argues that its current challenge to the ZSF was preserved by a statement made by Fishers Island resident Marguerite Purnell, asserting the ZSF was an "artificial construct." FSEIS at 4222. Putting aside that New York never expressed this view, Ms. Purnell's opinion did not require EPA to justify use of the ZSF, which the agency has never held out as a statutory or regulatory requirement. *See Pub. Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993) (comments must do more than state disagreement with an agency's premise or conclusions).

in the eastern Sound. Instead, as part of EPA's holistic approach to dredging across the entire Sound, and in tandem with the Corps' work with respect to the DMMP, the agency had simply decided to compare the viability of disposing material from the eastern Site at various candidates across the Sound.

EPA again memorialized its justification for the ZSF in its Draft Supplemental Environmental Impact Statement and Proposed Rule. *See* DSEIS at 98; *see also* AR-A 061 at 77. EPA highlighted that economic and environmental costs would be exacerbated by the inability of large barges to transport dredged material from many of the shallow, non-navigable areas that required dredging in the eastern Sound. *See* DSEIS at 98. Based on these considerations, EPA asserted that sites beyond the ZSF "would be economically and operationally infeasible." *Id*. New York again voiced no objection. New York's silence is particularly significant because it was clear that applying the ZSF ruled out the possibility that EPA would conclude that the Central, Western, and Rhode Island Sites were feasible alternatives to a site in the eastern Sound, regardless of their available capacity.

Consistent with the above, EPA concluded that without a new site in the eastern Sound, dredging would either be blocked—endangering public safety, economic activity, recreation and national security could suffer—or dredging would proceed, causing significant environmental and economic problems. Critically, the Central Site and the Rhode Island Site are 34.7 nautical miles and 44.5 nautical miles from New London Harbor, respectively. The Western Site is even farther, approximately 59 nautical miles west of New London Harbor. 81 Fed. Reg. 87820–01, 87822 (Dec. 6, 2016). EPA found that requiring dredging centers in the eastern Sound to transport their material to those sites "would likely render many dredging projects too expensive to conduct and needed dredging would not take place." FSEIS at 45. *See also* 81 Fed. Reg. at 87822.

The record plainly supports that conclusion. The ferry, shipbuilding, and boating industries in the eastern Sound depend on occasional dredging of the area's waterways to maintain the integrity of their routes. To that end, EPA received public comments stating that marinas on the Connecticut coastline have been essentially "choked off" by the lack of a nearby disposal site. Report of the Public Scoping Meetings at 77. The national security implications were even more stark. For example, the U.S. Navy Submarine Base is expected to generate 425,000 cubic yards of dredged material by 2025. The Corps estimated that disposal of that material at the Central Site would cost nearly $25 million, as opposed to less than $12 million at the Eastern Site. 81 Fed. Reg. at 87820-01. Disposal at the Western or Rhode Island Sites would be even more expensive in economic and environmental terms. It is unsurprising, therefore, that the U.S. Navy Submarine Base in New London, as well as Electric Boat, one of Connecticut's largest employers and maker of the Navy's *Columbia* class nuclear submarine, support designation of the Eastern Site. *See* Conn. Br. at 14-15. On this record, EPA has fulfilled its obligation to explain its reasoning, and the "court will not second-guess EPA's analysis nor 'undertake [its] own economic study.'" *Nat'l Wildlife Fed'n v. E.P.A.*, 286 F.3d 554, 565 (D.C. Cir. 2002) (alteration in original) (citation omitted). Against this backdrop, I turn to the two specific defects Plaintiffs argue undermine EPA's determination that a new site is needed in the eastern Sound.

c)      Beneficial Use of Dredged Sand

Plaintiffs allege EPA undercounted the portion of dredged sand that would likely be eligible for beneficial uses such as beach replenishment. NY Br. at 45–47. This alleged defect relates to the updated estimate EPA requested from the Corps in response to comments from New York asserting the DMMP overestimated how much disposal capacity that the eastern Sound would need over the next 30 years. When New York made this same claim during the public comment period, EPA had two rebuttals. First, EPA reiterated that because the agency was

concerned with ensuring operationally and economically feasible disposal for material dredged in the eastern Sound, the relevant consideration was how much sand would be dredged from the eastern Sound, not the entire Sound. FSEIS at 3528–3531; 81 Fed. Reg. at 87825–27. Second, EPA explained that in view of the uncertainties inherent in a 30-year projection, and the costs of underestimating disposal needs, the agency had taken a conservative approach to protect against that contingency. *Id*. Nonetheless, in response to these comments by New York and others, EPA requested that the Corps take a closer look at the projected dredging disposal needs in the eastern Sound. *See* 81 Fed. Reg. 87822; FSEIS at 78, 3415; AR-A 074 at 2.

The Corps' updated analysis, produced in September 2016, concluded that a site with only 20 million cubic yards would be sufficient:

> [T]he revised projected disposal capacity need of approximately 20 million cy is based on the need to accommodate approximately 12.5 million cy of suitable fine-grained sediment; 2.8 million cy from potential improvement (deepening) dredging projects; 1.8 million cy of shoal material resulting from extreme storm events; *1.1 million cy of sand (recognizing that beach nourishment may not be a practicable alternative for all 9.1 million cy of the projected sand)*; and 160,000 cy for the excavation of Confined Aquatic Disposal cells (for material unsuitable for open-water disposal); for a total of 18,364,500 cy; and a bulking factor of approximately 10 percent of the total, which brings the total to about 20 million cy.

81 Fed. Reg. at 87824 (emphasis added). EPA reviewed the Corps' updated projections and agreed that the eastern Sound could be serviced by a disposal site with 20 million cubic yards of capacity.

New York correctly points out, and EPA concedes, that whereas the agency had previously reasoned that all dredged sand *could* require open-water disposal, the Corps' September 2016 update assumed that only 12% dredged sand would likely require open-water disposal. New York suggests that "[i]f this assumption were applied to the original Sound-wide projection used to project disposal capacity need not only for an Eastern Sound site, but for the Western and Central Sites, the projection of dredged material relied on in the Proposed Rule would drop from 49.6 million cubic yards to 36.26 million cubic yards." New York Reply at 16. According to New York,

23

EPA therefore took two different approaches to the same data point, rendering the designation process arbitrary and capricious. NY Br. at 45–57. New York is incorrect.

EPA did not arbitrarily apply two different standards to the same data point at different times. Rather, EPA independently reviewed the Army Corps of Engineers' updated projections— which EPA requested in response to New York's concerns—and decided that based on those projections, the Eastern Site could be reduced from 22.6 to 20.2 million cubic yards. Without question, part of EPA's rationale was its conclusion that most of the sand dredged from the eastern basin could likely be used for beneficial uses like beach re-nourishment. But EPA's updated analysis was more refined than its initial review in other ways as well. For instance, it credited the Corps' updated finding that storms and other extreme weather events could produce *more* sediment than the DMMP initially projected. 81 Fed. Reg. at 87822, 87825–26; FSEIS at 3521–23, 3528– 29. In addition, EPA credited the Corps' 10% volume bulking factor to more accurately account for how sediment behaves once dumped in an open-water site. *See* 81 Fed. Reg. at 87823–24; FSEIS at 3529–30; AR-A 074 at 7–8. At the same time, EPA realized that one million cubic yards of material projected to be dredged near Guilford could be omitted from the dredging needs estimate for eastern Long Island Sound because Guilford is located closer to the Central Site, and would likely be disposed of at that site, rather than the Eastern Site. FSEIS at 78; AR-A 074 at 3. Having responded to New York's comments regarding the eastern Sound's dredging needs, EPA was under no obligation to revisit its Sound-wide projection, which was not the basis for its determination that a new site was needed in the eastern Sound. *See Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1063 (D.C. Cir. 2017) ("Agencies need not reanalyze alternatives previously rejected, particularly when an earlier analysis of numerous reasonable alternatives was incorporated into the final analysis and the agency has considered and responded to public comment favoring other alternatives."). Forcing EPA to update the estimated amount of

sand that may be beneficially repurposed Sound-wide "would be an idle and useless formality" without any impact on the Final Rule. *Li v. I.N.S.*, 453 F.3d 129, 136–37 (2d Cir. 2006) (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)).

        d)      The Rhode Island Site

The second defect Plaintiffs allege with respect to EPA's determination that a new site was needed in the eastern Sound is that EPA ignored the feasibility of relying on the Rhode Island Sound Disposal Site.[4] I have already agreed that EPA's ZSF was reasonable and need not retread that territory here. Nonetheless, I address the arguments New York raises with respect to the Rhode Island Site specifically. First, New York argues EPA arbitrarily ignored the fact that the Rhode Island Site has previously been deemed a suitable option for disposal of dredged spoils from two portions of the Eastern Sound—Mystic Harbor and Little Narragansett Bay. Second, New York argues that EPA's decision not to rely on the Rhode Island Sound Site was contrary to the agency's own statement that it was designating the eastern Site to service, among other areas, Rhode Island's waters. Both arguments are without merit.

With respect to Mystic Harbor, the Corps estimated that federal maintenance and improvement projects will require dredging approximately 550,000 cubic yards of fine sediment suitable for open-water disposal over the next 30 years. DMMP at 5159. While Mystic Harbor is approximately seven nautical miles from the Eastern Site, it is considerably farther from the Rhode

---

[4] New York's first claim for relief alleges that EPA "excluded the possibility of disposing of any material from the eastern Sound at the Rhode Island Site, even though the Sound extends well into Rhode Island, and that site has ample remaining capacity and lies only 44 nautical miles from the New London Harbor dredging center." Amended Complaint ¶ 146. While New York's opening brief follows this argument, New York's Reply appears to broaden this allegation to encompass the Central and Western Sites, in addition to the Rhode Island Site. *See* New York Reply at 26. Because the Complaint governs, and because the Central and Western Sites are addressed in the discussion of New York's third claim, *see infra* at Section IV.B.3, my discussion here focuses on the Rhode Island Site.

Island Site. DMMP at 5242. Unsurprisingly, when the Corps compared the estimated cost of disposing sediment from Mystic Harbor at the New London Site against alternatives, the Rhode Island Site was not even among the 15 most feasible alternative sites in terms of cost and available capacity. DMMP at 242. (That same alternative site screening estimated that disposal at the Central and Western Sites would be more than two and three times as expensive as disposal at the New London Site, respectively.) This finding was consistent with the Corps' estimate that disposing of sediment dredged from New London Harbor at the Central or Rhode Island Sound Sites would be 2.7 times the cost of using the New London Site. *Id*. at 255. Similarly, the Corps' analysis demonstrated that disposing of fine-grained material from Little Narragansett Bay at the Rhode Island Site would cost 77% more than at the New London Site. *Id*. at 239. Beyond Mystic Harbor and Little Narragansett Bay, the Corps' analysis presents a clear picture that even though the Rhode Island Site has an estimated remaining capacity of 16.5 to 19.5 million cubic yards, it would be prohibitively expensive for federal and private dredgers in the eastern Sound. *Id*. at 164. As just one example, the Corps estimated that disposing of the 785,300 cubic yards of fine sediment from federal navigation maintenance projects in New London Harbor would be 269% more expensive at the Rhode Island Site. *Id*. at 576.

Finally, EPA simply did not designate the Eastern Site to serve all of Rhode Island waters. Instead, EPA designated the Eastern Site to serve the eastern Sound, which includes a small portion of Rhode Island's waters near Block Island Sound. *See* 81 Fed. Reg. at 24762; FSEIS at 63–64 (Fig. 1-2), 73. In fact, EPA omitted projects from this small area in its estimates for eastern Sound dredging disposal needs precisely because dredging centers there would likely use the Rhode Island Site instead of the Eastern Site. *See* 81 Fed. Reg. at 24750; FSEIS at 102. For these reasons, Plaintiffs' first claim fails.

2.    *Interference with Shipping and Navigation*

Plaintiffs' second claim is that EPA failed to consider vessel traffic across the Eastern Site, and Cross Sound Ferry's route between New London and Orient Point in particular. Plaintiffs allege that EPA failed to respond to this same concern during the public comment period, and that these defects violated EPA's obligation to apply certain general and specific criteria related to navigation, Sections 228.5(a) and 228.6(a)(8). *See* NY Br. at 50. Under Section 228.5(a), "[t]he dumping of materials into the ocean will be permitted only at sites or in areas selected to minimize the interference of disposal activities with other activities in the marine environment, particularly avoiding areas of existing fisheries or shellfisheries, and regions of heavy commercial or recreational navigation." 40 C.F.R. § 228.5(a).[5] Next, under Section 228.6(a)(8), EPA is required to consider a proposed site's potential "[i]nterference with shipping, fishing, recreation, mineral extraction, desalination, fish and shellfish culture, areas of special scientific importance and other legitimate uses of the ocean." *Id*. § 228.6(a)(8).

EPA's Final Rule argues the site satisfies provisions for five reasons: (1) the site is not located in shipping lanes or any other region of heavy commercial or recreational navigation; (2) the site is not located in an area that is important for commercial or recreational fishing or shellfish harvesting; (3) use of the site would have minimal potential for interfering with other existing or ongoing uses of the marine environment in and or around the ELDS, including lobster harvesting or fishing activities; (4) the adjacent, and now closed, NLDS has been used for dredged material disposal for many years and activity there has not significantly interfered with the uses identified

---

[5] New York and EPA disagree about whether Section 228.5(a) requires that the EPA "avoid" regions of heavy commercial or recreational navigation, or whether it merely requires the agency to select sites "to minimize the interference with" those regions. But to the extent the provision is ambiguous, this court defers to EPA's reasonable interpretation in view of the fact that the agency "conduct[ed] factual investigations . . . consult[ed] with affected parties, [and] consider[ed] how their experts have handled similar issues over the long course of administering a regulatory program." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2413 (2019) (plurality opinion).

in this regulation, but mariners in the area are accustomated to dealing with the presence of a dredged material disposal site; and (5) time-of-year restrictions imposed to protect fishery resources will typically limit dredged material disposal activities to the months of October through April, thus further minimizing any possibility of interference with the various maritime activities in the area. 81 Fed. Reg. at 87833.

The record plainly demonstrates that the designation of the Eastern Site comports with EPA's navigation-related regulatory criteria. Notably, although New York insists the site will threaten Cross Sound Ferry's route between New London and Orient Point, Cross Sound itself has filed an amicus brief—along with nearly a dozen other ferry and boating operators—rejecting that exact argument as "entirely false." ECF No. 78, Ferry Br. at 17. As Cross Sound states, "[f]erries are not confined to a discrete specific route, but rather operate in a three-mile area when travelling between Connecticut and New York, the exact route being different for every crossing depending on a variety of factors including weather conditions, visibility, sea state, state and magnitude of tide and current, *and marine traffic conditions*." *Id*. at 17–18 (emphasis added). Thus, any given ferry can adjust its route in the unlikely event that a scow is operating in its path. In fact, Cross Sound's ferries never experienced any problems from the use of the New London Disposal Site, and there is no reason to expect the Eastern Site will present distinct challenges. *Id*. at 18.

Cross Sound and other navigation companies made their support for the Eastern Site known from the beginning of EPA's scoping and screening process. At an initial public scoping meeting, the representative of Cross Sound and other ferry companies commented:

> Economically, if dredging projects are to occur in Eastern Connecticut and there is not an Eastern Long Island Sound disposal area, those dredge spoils have to be towed to either the Central Long Island Sound disposal site or the Western Long Island Sound disposal site. The cost of that additional towing can more than double the cost of the dredging. That is the economic impact. The environmental impact of towing those dredge spoils across Long Island Sound can be measured in air quality impacts. To tow those dredge spoils a tug has to tow that scow. That tug burns diesel fuel. The amount of diesel fuel that it takes to tow a scow from Eastern Connecticut

to these disposal sites, as compared to towing them right to an Eastern Long Island
Sound disposal site, is significant.

Report of the Public Scoping Meetings at 76.[6] No one contested this comment or its clear
implications regarding the need for a site in the eastern Sound. Thus, there is no evidence that
EPA's determination that the Eastern Site would not interfere with such navigation was a "post
hoc" or "convenient litigating position." *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142,
155 (2012) (quotation omitted). To the contrary, EPA's position is supported by multiple reliable
sources, including Cross Sound itself.

Ignoring this evidence, New York focuses on a single map (the "Density Map") EPA used
in public meetings in 2013, which New York argues misled the agency's consideration of
navigation near the Eastern Site. New York asserts the Density Map misrepresented that data from
2009 was from 2012, and, separately, undercounted vessel traffic in the vicinity of the Eastern Site.
NY MSJ at 52-59. These arguments are without merit.

When EPA presented the Density Map in May 2013, the agency accompanied the map with
a note stating, "[t]he density grid was created using tracklines that were generated from the 2009
United States Automatic Identification System Database; the data grids represent only 339 days in
2009." FSEIS at 990. The meeting's attendees, including representatives from NY DOS, were on
clear notice that the map was based on 2009 data, and made no objections or comments demanding
more current information. EPA Br. at 56. Next, while the Density Map was used in the May 2013
to convey a snapshot of traffic patterns, it was not the basis for EPA's determination that the
Eastern Site would accommodate regional navigation pursuant to the criteria under Sections 228.5
and 228.6. Indeed, in support of that conclusion, EPA relied on an array of sources, including more

---

[6] Wronowski made these same points in a contemporaneous letter submitted to the EPA. AR-A 105
at 2.

current data provided by the Corps, the Coast Guard, and the ferry operators themselves. EPA Br. at 59–60. New York has not shown how EPA's reliance on these sources, much less the agency's conclusion that the Eastern Site posed no threat to navigation in the site's vicinity, was unreasonable. *See Baltimore Gas*, 462 U.S. at 103.

Finally, Plaintiffs have no answer to EPA's argument that time-of-year restrictions will ensure that scows will not interfere with navigation. These restrictions will limit dredge disposal at the Eastern Site to October through April, when ferry traffic is considerably lower. And during these months, notice will be provided to mariners in the area when disposal occurs. Combined with the fact that the shallowest disposal depth permitted at a designated site would be 59 feet, there is no reason to expect that the disposal site will present navigational challenges to the eastern Sound's boating and shipping communities. 81 Fed. Reg. at 87833; FSEIS at 43. On these facts, Plaintiffs' second claim is without merit.

3.   *EPA's Consideration of Previously Used Disposal Sites*

Plaintiffs' third claim is that designation of the Eastern Site violated the MPRSA and was arbitrary and capricious because "it was feasible to designate the historically used Niantic Bay Site, or use the designated Western, Central, and Rhode Island Sites." Amended Complaint ¶¶ 48–49. Here, New York does not press its claim that EPA should have designated the Niantic Bay Disposal Site, but continues to assert that EPA arbitrarily excluded the Rhode Island Site from consideration.[7] New York further argues that the agency disingenuously labeled the Eastern Site as a historically used site insofar as it incorporated a portion of the NLDS.

---

[7] EPA's April 2016 Proposed Rule indicated that EPA was considering the possibility of designating one or two additional dredged material disposal site alternatives within the ZSF—the Niantic Bay Disposal Site ("NBDS") and the Cornfield Shoals Disposal Site ("CSDS"). *See* 81 Fed. Reg. 24748, 24749. EPA considered designated these sites, individually or together, as either a substitute for, or a complement to, the Eastern Site. But EPA determined they were less suitable than the Eastern Site for a variety of reasons. Indeed, the public comment period elicited adamant opposition to designating the Niantic Bay Site. *See* FSEIS at 3699.

EPA responds first by reiterating that it was not feasible to designate the Western, Central, or Rhode Island Sites for disposal of material dredged in the eastern Sound. I agreed with EPA's reasoning to that effect with respect to Plaintiffs' first claim and do so again here. Next, EPA responds that this claim must fail because there is no requirement to designate available historically used sites. EPA is correct on this point as well.

Contrary to what Plaintiffs suggest, EPA's site selection criteria do not require the agency to designate historically used sites with remaining capacity regardless of other considerations. One of EPA's general site selection criterion is that the agency "will, wherever feasible, designate ocean dumping sites beyond the edge of the continental shelf and other such sites that have been historically used."[8] 40 C.F.R. § 228.5(e). New York emphasizes the word "will," New York Br. 68, suggesting the provision constitutes a mandate, even though "will" is immediately qualified by the phrase "wherever feasible." New York argues that in interpreting feasibility under Section 228.5(e), EPA overemphasized economic cost, pointing to the following passage from EPA's 1986 Ocean Dumping Site Designation Delegation Handbook:

> The distance from the dredge area to dump site affects the costs of ocean disposal operations. However, cost of disposal cannot be the main consideration used for locating a site. Alternate siting at greater distances from the dredging area must be considered when they offer environmental benefits at reasonable increases in costs.

AR-A-061, Designation Handbook at 77. New York argues that particularly in light of prior instances of eastern Sound dredging centers shipping material to the Central and Western Sites,[9] EPA arbitrarily ruled out relying on these sites in the future.

---

[8] EPA determined that because the continental shelf lies as far from the eastern Sound dredging centers as the WLDS, CLDS, and RISDS, a site there would be similarly impractical. FSEIS at 45.

[9] I observe that prior disposal of certain eastern Sound material at the Central and Western Sites indicates nothing about whether other projects were stalled or cancelled, let alone whether those sites are viable options going forward.

But New York's reliance on the Designation Handbook is misplaced. In a nearby passage, the Handbook also states that "[f]or new sites, the best site will be selected, with *the best site being defined as the candidate site that has the least adverse environmental impact at acceptable economic cost*." *Id*. at 60 (emphasis added). Read in its entirety, the Designation Handbook supports EPA's holistic approach to its regulatory criteria. As explained above, *see supra* at Section IV.B.1, these considerations reasonably supported EPA's conclusion that "candidate disposal sites more than 25 nautical miles (nmi) (46 km) from a dredging center in the eastern Long Island Sound were determined to be neither economically nor operationally feasible." DSEIS at 98. *See also* 81 Fed. Reg. at 24749–50, 24762. Incidentally, the only way EPA could have come to a different conclusion would have been to ignore the dredging needs of eastern Sound communities.

Turning to the historically-used sites *within* the ZSF, New York's claim is difficult to square with the fact that EPA shifted the Eastern Site westward precisely because New York objected to adding dredged material to the existing New London Site. EPA Response to New York Objection at 15. After New York made this objection:

> EPA decided to shift the boundaries of the ELDS to the west so that the site would be entirely outside of the submarine transit corridor into the Thames River, the existing [New London Disposal Site], and New York state waters, as well as farther from Fishers Island . . . EPA also adjusted the boundaries of the ELDS to exclude two hard-bottom areas that have the potential to provide relatively more valuable marine habitat. These modifications to the site boundaries reduced the area of the ELDS from two square nautical miles ($nmi^2$) to approximately a.3 $nmi^2$), and the capacity of the site from approximately 27 mcy to 20 mcy.

*Id*. In addition, EPA's exclusion of certain portions of the New London Site aimed to protect sensitive lobster habitat close to Fishers Island. 81 Fed. Reg. at 87833, 87838.

In sum, EPA properly balanced the preference for historic sites against the other general and specific criteria enumerated in Sections 228.5 and 228.6, which reflect the full range of environmental values embedded in the MPRSA. 81 Fed. Reg. 87822–23.

4.     *EPA's Consideration of Non-Federal Projects Under 25,000 cy*

Plaintiffs' fourth claim is that EPA's failure to consider the environmental impacts of dredged materials exempt from MPRSA standards rendered the designation of the Eastern Site procedurally flawed. NY Br. at 69. Specifically, Plaintiffs assert EPA ignored dredged material that will be sourced from non-federal projects of less than 25,000 cubic yards, triggering only the testing standards of the Clean Water Act, and not the MPRSA standards that govern disposal of all projects over 25,000 cubic yards. Plaintiffs further insist that due to this lapse in EPA's in decision-making there is a "very real possibility that millions of cubic yards of dredge spoils destined for the Eastern Site will be screened for suitability under the Clean Water Act, not the [MPRSA]." *Id*. at 70. Finally, Plaintiffs argue that EPA's alleged failure to account for the smaller non-federal projects undermines EPA's "assumption" that all dredged material dumped at the Eastern Site will meet the standards of the MPRSA. *Id*.

Southold Commissioner Scott Russell raised the substance of this claim in a public hearing on May 25, 2016. Russell asked three questions: (1) what is the sampling protocol of the sediments from non-Federal facilities; (2) how do the Federal and non-Federal sediment testing protocols compare to each other; and (3) what are the quality control measures on testing of non-Federal projects? FSEIS at 3696. Russell also submitted written comments and questions on behalf of Southold.

EPA responded to Southold's comments, and explained the overlapping regulatory structures of the CWA and MPRSA as follows:

> The commenter asks if the protocols are the same for non-federal and federal projects. . . [and] expresses concern that material from smaller non-federal dredging projects might still be placed in open water with management steps under Section 404 of the Clean Water Act (CWA), despite the material's potential to cause adverse impacts. In addition, [he] is concerned that non-federal projects may be "segmented" into smaller projects involving 25,000 cubic yards or less in order to remain below the qualifying threshold for the MPRSA and to avoid addressing the cumulative adverse impacts of multiple events . . .  The evaluation of dredged

> material proposed for open-water disposal is governed by the requirements of
> USEPA's sediment quality criteria regulations found at 40 CFR Part 227 as well as
> a set of memoranda or "manuals" developed under the regulation to provide more
> detailed guidance . . . The manuals provide national technical guidance for
> determining the suitability of dredged material for disposal in ocean and inland
> waters through physical, chemical, and biological evaluations. The manuals
> recommend standardized testing procedures and, among other things, provide
> guidance on choosing appropriate test organisms for bioassay testing . . . In
> addition, the Regional Implementation Manual (RIM), consistent with the Green
> Book and the Inland Testing Manual, provides specific testing and evaluation
> methods for dredging projects in New England and outlines the USEPA and
> USACE coordination process.

FSEIS at 3550–3553. Plaintiffs' claim that EPA failed to consider the disparate testing regimes

under the CWA is impossible to square with EPA's response to Southold's comments.

There is no basis for New York's claim that EPA's treatment of potential small, non-federal

dredging was procedurally defective. Under the Ambro Amendment, it is clear that the MPRSA

applies to the dumping of dredged material by federal agencies, or by private parties dumping

more than 25,000 cubic yards of dredged material. But it is equally clear that Congress left testing

of sediment proposed through smaller, non-federal projects to the regulatory framework of the

Clean Water Act. That is not to say that Congress failed to consider small non-federal projects. To

the contrary, Representative Ambro himself noted that federal projects and private operations

dredging more than 25,000 cubic yards comprised the overwhelming majority of dredging activity

in the Sound. *Town of Huntington*, 859 F.2d at 1139 (citing 126 Cong. Rec. H34063 (Dec. 13,

1980) (remarks of Rep. Ambro)). Thus, to the extent the MPRSA may demand more stringent

testing than the CWA, that is "because federal law makes it so." Conn. Br. at at 33. EPA simply

enforced the mandatory limits of federal law, which in general mean "that disposal in the Long

Island Sound is controlled by *more* stringent standards than apply to dredged material disposal

anywhere else." *Id*. To the extent New York disagrees with the scope of the MPRSA, such

disagreement does not constitute a viable legal claim.

Moreover, throughout the screening and designation process, EPA repeatedly pointed out that Section 404 of the Clean Water Act would cover disposal of dredged material from smaller non-federal projects. Plaintiffs offer no substantive attack on the Clean Water Act's testing standards, other than to say they are deficient because they are less stringent than those under MPRSA. New York also overlooks the permitting process's gatekeeping function. Section 1344(b) of the CWA directs the Corps to issue permits for discharges of dredged or fill material based on the application of EPA guidelines, published at 40 C.F.R. Part 230. These guidelines establish that: (1) no discharge will be permitted if "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystems, so long as the alternative does not have other significant adverse environmental consequences," 40 C.F.R. § 230.10(a); and (2) "no discharge . . . shall be permitted which will cause or contribute to significant degradation of the waters of the United States." *Id*. § 230.10(c). Thus, under both the MPRSA and CWA, disposal cannot take place until a project-specific review has been conducted and the required permit or authorization has been issued. And as New York concedes, EPA consults "the highly technical EPA/Army Corps Regional Implementation Manual for the Evaluation of Dredged Materials Proposed for Disposal in New England Waters, a 2004 agency guidance manual," when making such decisions. NY Br. at 77; AR-A-208. On this record, it is unclear what else EPA could have done beyond explaining the regulatory framework related to sediment testing and incorporating the Regional Implementation Manual's protocols into its decision-making process. Indeed, New York concurred in site use restrictions for the Central and Western Sites that recognized the Ambro Amendment's scope *and* limitations. 40 C.F.R. §§ 228.15(b)(4)(vi), 228.15(b)(5)(vi).

Finally, Plaintiffs' concerns about segmentation and cumulative impacts are premature. Permit actions under Section 404 of the CWA trigger NEPA review, providing opportunities to raise these exact issues. DSEIS at 58. To the extent segmentation of non-federal projects poses a

hypothetical risk, the courts stand ready to guard against such gamesmanship if and when it arises. *See Town of Huntington*, 859 F.2d at 1140 (voicing "serious doubts as to whether the Corps should have considered the [dredging] Applicants separately" where the total yardage of waste collected among them would exceed 25,000 cubic yards). Until that juncture, Plaintiffs cannot complain that EPA abided by the applicable statutory scheme. *Pub. Citizen, Inc.*, 988 F.2d at 197 (D.C. Cir. 1993) (agencies need not respond to comments raising speculative problems).

C.    Southold's Additional APA Arguments

In addition to joining New York's claims, Southold argues EPA arbitrarily and capriciously failed to respond to certain comments submitted by Town Supervisor Russell, Fishers Island resident Marguerite Purnell, and the Fishers Island Conservancy. An agency "need not address every comment, but it must respond in a reasoned manner to those that raise significant problems." *City of Waukesha v. E.P.A.,* 320 F.3d 228, 257 (D.C. Cir. 2003) (quoting *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997)). Thus, when a public comment raises a major substantive concern, an agency's failure to respond can render a decision arbitrary and capricious. *Sierra Club v. E.P.A.*, 863 F.3d 834, 838 (D.C. Cir. 2017). I have reviewed the record in detail and disagree with Southold's claims. EPA sufficiently responded to each of the comments and objections raised by Southold, Purnell, and Fishers Island. Many of the concerns Southold raises echo points dealt with above, and I need not retread that territory here. Nonetheless, to the extent Southold's claims raise distinct points, I briefly discuss why they are without merit here.

First, EPA explained why the site management plan for the Eastern Site does not include an in-depth overview of remediation protocols. Southold asked EPA whether EPA's economic analysis included potential remediation and bonding costs, and whether the agency was going to include remediation plans in its rule designating the Eastern Site. EPA squarely responded to these

questions, explaining that while remediation and bonding were outside the scope of designation, the site's management plan would include protocols for discerning whether post-disposal remediation may be needed, and what form such remediation could take. This answer fulfilled EPA's obligations under the APA. *See Cement Kiln Recycling Coal. v. E.P.A.*, 493 F.3d 207, 225–26 (D.C. Cir. 2007).

Second, EPA sufficiently addressed Southold's concerns regarding EPA's reliance on testing manuals from the 1990s. EPA explained that "regardless of their age, these manuals continue to be relied upon and are scientifically valid and protective of the environment." EPA Br. at 94. Southold has failed to explain why the age of these manuals renders the agency's reliance upon them defective, or which resources the agency should have consulted in their place.

Third, EPA thoroughly responded to concerns—raised by Southold, Ms. Purnell, and the Fisher Island Conservancy—regarding the potential cumulative effects of toxic sediment disposal at the Eastern Site. As a general matter, EPA responded that "sediment quality criteria regulations found at 40 CFR Part 227 will preclude the placement of toxic material" at the Eastern Site. FSEIS at 3553. EPA further explained that "[t]oxicity tests are conducted on benthic organisms and risk assessments are conducted using lobster, fish, clam, and worm data, and this work supports the designation of the ELDS." *Id*. The FSEIS also discusses how Eastern Site will not adversely impact benthic organisms, lobsters, fish, or clams because the site is not home to substantial populations of those species. Indeed, EPA excluded preferred lobster habitats from the final Eastern Site, which has a flat and sandy bottom, without the structures that support diverse fish and shellfish populations. 81 Fed. Reg. at 87824.

Fourth, EPA sufficiently responded to concerns raised by the Fishers Island Conservancy regarding the possible dispersion of contaminated sediment during the disposal process. Specifically, a representative of the Conservancy asserted that disposal of sediment in the shallow

waters near Fishers Island would lead to an unacceptable risk of contaminants dispersing into the water column before reaching the seafloor. Southold Br. at 49. Again, EPA explained that the permitting and testing processes would effectively screen out toxic sediments in dredged material. *See* FSEIS at 50, 52-55, 61, 3518–19. And more specifically, EPA determined that "99-100 percent of sand, silt, and clumps would reach the seafloor under both mean and high flow conditions. Under high flow conditions, 83 percent of the clay would reach the seafloor during disposal operations, while 96 percent of the clay would reach the seafloor under man flow conditions." *Id.* at 3549. EPA's analysis also demonstrated that precisely because the Eastern Site is relatively shallow, it contains less essential fish habitat than the (deeper) previously-used sites in the eastern Sound. *See* AR-15, Essential Fish Habitat Assessment. In addition, the two endangered fish who have been found in the vicinity of the Eastern Site, the shortnose sturgeon and the Atlantic sturgeon, are highly mobile species that are not expected to be impacted by occasional disposal activities. AR-16, Draft Eastern Site SMMP at 27. Finally, EPA explained that after each disposal, the Corps compares the conditions of the seafloor to pre-disposal conditions, ensuring the Corps learns how much material was dispersed in the process. *Id.* Southold offers no explanation for how this process is deficient. For these reasons, Southold's claims are without merit.

      D.    <u>Plaintiffs' CZMA Claims</u>

The last claim in this action is that EPA's designation of the Eastern Site violated the APA because the designation of the Eastern Site was "not in accordance" with the CZMA, which is to say it was not "carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies" of New York's federally-approved coastal management program. Amended Complaint ¶¶ 173-77.

NOAA regulations under the CZMA explain that:

An enforceable policy shall contain standards of sufficient specificity to guide public and private uses. Enforceable policies need not establish detailed criteria

38

> such that a proponent of an activity could determine the consistency of an activity without interaction with the State agency. State agencies may identify management measures which are based on enforceable policies, and, if implemented, would allow the activity to be conducted consistent with the enforceable policies of the program.

15 C.F.R. § 930.11(h).

Under the CZMA, all federal agency activities that affect a land or water use or natural resource in a coastal zone must be "carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies" of any state coastal management program which encompasses that coastal zone and which has been approved by the U.S. Secretary of Commerce. 16 U.S.C. § 1456(c)(1)(A). While long-term site designation does not itself permit the disposal of any material, such disposal—and its secondary effects on coastal uses—is an "indirect" effect that triggers CZMA obligations under Department of Commerce regulations. 15 C.F.R. § 930.11(g).

There is no dispute EPA met its procedural obligations to determine whether the Eastern Site was consistent to the maximum extent practicable with both New York's CMP and Long Island's WRP. Consistent with CZMA § 307(c), in July 2016, shortly after EPA and New York came to an agreement that the designation of the Western and Central Sites was consistent with New York's CMP, EPA delivered its 50-page consistency determination to the NY DOS. AR-18. New York responded with its objections on October 3, 2016, and EPA responded to those objections in a 59-page letter dated November 4, 2016. Although EPA's response expressly noted that the agency had adjusted the Eastern Site in a good-faith effort to ameliorate New York's concerns, New York apparently did not reply one way or another to the agency's subsequent outreach.

Here, Plaintiffs renew many of the arguments raised in New York's objections, and allege the designation process for the Eastern Site was inconsistent with the following five policies: Policy 5 of the Long Island Sound and Southold Programs, to Protect and Improve Water Quality

and Supply; Policy 6 of the Long Island Sound and Southold Programs, to Protect and Restore the Quality of Function of the Ecosystem; Policy 8 of both Programs, to Minimize Environmental Degradation from Solid Waste and Hazardous Substances and Wastes; Policy 10 of both Programs, to Protect Water-Dependent Uses; and Policy 11 of both Programs, to Promote the Sustainable Use of Living Marine Resources.

As a general matter, New York is correct that its CZMA claim is adjudicated under a different standard than its MPRSA claims, and in theory, neither is dispositive of the other. Nonetheless, New York rests its CZMA claim largely on the "same conduct and actions upon which New York's first four claims for relief" are based. NY Br. at 84. I rejected those claims above and reject the same arguments here. Proceeding from that baseline, New York has not offered any additional viable explanations for how EPA's designation of the Eastern Site is inconsistent with New York, Long Island, or Southold's Programs. This is especially significant in light of regulations requiring that "enforceable policies" "contain standards of sufficient specificity to guide public and private uses." 15 C.F.R. § 930.11(h). In the absence of such standards, accepting New York's view of what constitutes a violation of their policies would effectively transform their coastal programs into a veto over otherwise lawful agency actions.

In addition, New York's repeated assertion that the previously unused portion of the Eastern Site represents an "unwarranted expansion" of the New London Site that may adversely affect environmental conditions is without merit. NY Br. at 84–88. Throughout the designation process, EPA emphasized its view that the historically used portion of the NLDS, combined with the new NL-Wa and NL-Wb areas, would constitute a suitable disposal site precisely because it is a containment site, from which disposed material will not depart. EPA supported this position with a series of studies looking at the stability of sediment in the water column and near the seafloor.

*See, e.g.*, AR-10 (FSEIS App. C, Physical Oceanography Study). Likewise, as the FSEIS points out:

> concerns about the disposal of toxic sediments at the NLDS and other Long Island Sound disposal sites also have been addressed by the [Corps]'s Disposal Area Monitoring System (DAMOS), which has collected data at these sites since the late 1970s. The program has generated over 200 detailed reports addressing questions and concerns related to placement of dredged material in the Sound. These reports indicate that toxic sediments are not being placed at open-water disposal sites. Moreover, sequential surveys of biological conditions at sites following the placement of dredged material consistently show a rapid recovery of the benthic community to that of the surrounding habitat outside the disposal sites. Monitoring at the NLDS has verified that past management practices have been successful in adequately controlling any potential adverse impacts to water quality and benthic habitat. With the nearly 40-year record of surveys, these investigations also have also demonstrated long-term stability of the mounds at all three containment sites in Long Island Sound (i.e., WLDS, CLDS, and NLDS).

FSEIS at 3519 (response to comment 2).

Finally, New York was directly involved in the development of the site use restrictions for the Central and Western Sites and concurred that they were satisfactory under the New York CMP. Plaintiffs offer no good explanation for why those same restrictions are all of a sudden violative in the context of the Eastern Site. Meanwhile, EPA has explained that the uniformity of site restrictions across the entire Sound will contribute to providing "a rational predictable, and consistent regulatory regime to the public." EPA Response to New York Objection at 16.

On this record, there is no doubt that EPA's consistency determination "was the result of a thorough and reasonable analysis of the relevant factors and different alternatives available." *Matter of Defend H20 v. Town Bd. of the Town of E. Hampton*, 147 F. Supp. 3d 80, 111 (E.D.N.Y. 2015). *See also Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir.2007) ("[S]o long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned.").

**CONCLUSION**

So long as there are practical limits to the beneficial uses of dredged material, there will be fierce disputes over where such material goes. In adjudicating this particular dispute, I neither endorse the practice of open-water disposal, nor discourage EPA from pursuing more environmentally sustainable alternatives. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020). Instead, I simply conclude that, in designating the Eastern Site, EPA based its findings on substantial evidence, and followed the agency's obligations under the law. *See Jewell*, 815 F.3d at 9. For these reasons, Plaintiffs' and Plaintiffs-Intervenors' motions for summary judgment are denied, and Defendants' and Defendant-Intervenor's cross-motions for summary judgment are granted.

                                          **SO ORDERED.**

                                          *Edward R. Korman*

Brooklyn, New York                        Edward R. Korman
July 17, 2020                             United States District Judge